# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                 No. CR 15-0393 JB

JAVIER CORCHADO-AGUIRRE,

      Defendant.

## <u>UNSEALED MEMORANDUM OPINION</u>[1]

**THIS MATTER** comes before Court on: (i) the Fast Track Plea Agreement, filed February 6, 2015 (Doc. 12)("Plea Agreement"); (ii) the Defendant's Sealed Sentencing Memorandum, filed April 15, 2015 (Doc. 15)("Memo. I"); and (iii) the Defendant's Sealed Sentencing Memorandum, filed June 26, 2015 (Doc. 22)("Memo. II"). The Court held sentencing hearings on April 22, 2015, and July 17, 2015. The primary issues are: (i) whether the Court should accept or reject the Plea Agreement; (ii) whether the Court should vary or depart downward because of Defendant Javier Corchado-Aguirre's mental illness; and (iii) whether the Court should depart downward because Corchado-Aguirre's criminal history is over represented. The Court will reject the Plea Agreement, because the resulting sentence does not adequately reflect the factors that Congress has laid out for the Court to consider in 18 U.S.C. § 3553(a). The Court will not vary downward because of Corchado-Aguirre's mental illness,

---

[1]In its Sealed Memorandum Opinion and Order, filed August 22, 2015 (Doc. 38)("Sealed MOO"), the Court inquired whether the parties had any proposed redactions to protect confidential information within the Sealed MOO before the Court published a public version of the Sealed MOO. Sealed MOO at 1 n.1. The Court gave the parties 7 calendar days to provide notice of any proposed redactions. <u>See</u> Sealed MOO at 1 n.1. The parties have not contacted the Court or made any filings within CM/ECF to indicate that they have any proposed redactions. Consequently, the Court is now re-filing the Sealed MOO in its unsealed form.

because his mental illness does not place him outside the heartland of cases.  Because Corchado-Aguirre's criminal history is over represented, however, the Court will depart downward to better reflect the seriousness of criminal history.  Finally, the Court will sentence Corchado-Aguirre to 16-months imprisonment.

## FACTUAL BACKGROUND

The Court takes its facts from the Presentence Investigation Report, disclosed March 17, 2015 ("PSR"), which the United States Probation Office ("USPO") prepared.  United States Border Patrol agents encountered Corchado-Aguirre near Sunland Park, New Mexico.  See PSR ¶ 5, at 3.  Corchado-Aguirre was attempting to hide behind a mesquite bush, and admitted that he was a Mexican citizen and did not have legal authorization to enter or remain in the United States.  See PSR ¶ 5, at 3.  The Border Patrol agents determined that Corchado-Aguirre had previously been deported subsequent to a felony conviction.  See PSR ¶ 5, at 3.

## PROCEDURAL BACKGROUND

Plaintiff United States of America and Corchado-Aguirre entered into a plea agreement under rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure and pursuant to the United States Attorney's Office for the District of New Mexico's fast-track program.[2]   See Plea

---

[2]"To expedite the handling of large volumes of cases involving persons accused of immigration offenses, certain judicial districts employ fast-track programs."  United States v. Martinez-Trujillo, 468 F.3d 1266, 1268 (10th Cir. 2006), overruled by United States v. Lopez-Macias, 661 F.3d 485 (10th Cir. 2011).  "In section 401(m)(2)(B) of the PROTECT Act of 2003, Pub. L. No. 109-21, § 401(m)(2)(B), 117 Stat. 650, 675, Congress approved early disposition or fast-track programs if certain conditions are met."  United States v. Rocha-Nunez, No. CR 11-2848 JB, 2012 WL 1372288, at *5 (D.N.M. Apr. 16, 2012)(Browning, J.).

A provision of the PROTECT Act directed the United States Sentencing Commission to "promulgate . . . a policy statement authorizing a downward departure of not more than 4 levels if the Government files a motion for such departure pursuant to an early disposition program authorized by the Attorney General and the United States Attorney."  Pub. L.  No. 108-21, § 401(m), 117

Agreement at 1.  On February 6, 2015, 2015, Corchado-Aguirre pled guilty, pursuant to the Plea

Agreement, before the Honorable Steven C. Yarbrough, United States Magistrate Judge for the

District of New Mexico.  See Plea Minute Sheet at 1, filed February 6, 2015 (Doc. 13).  The

---

Stat. at 675.  The Sentencing Commission accordingly added a new Guidelines
section, effective October 27, 2003, authorizing such four-level departures.  See
U.S.S.G. § 5K3.1, p.s.

United States v. Morales-Chaires, 430 F.3d 1124, 1127 (10th Cir. 2005)
Originally, as the Tenth Circuit has stated: "The decision to adopt the [fast-track
program] in a district [was] made by the United States Attorney General and the United States
Attorney for the district."   United States v. Diaz-Devia, 425 F. App'x 764, 767 (10th
Cir. 2011)(unpublished)(alterations in United States v. Diaz-Devia but not in source)(citation
omitted)(internal quotation marks omitted).  "In jurisdictions where fast-track programs have
been authorized by the Attorney General, defendants must agree to the factual basis of the
criminal charge and waive the rights to file pretrial motions, to appeal, and to seek collateral
relief (except for ineffective assistance of counsel)."  United States v. Morales Chaires, 430 F.3d
at 1127 (alterations omitted)(internal quotation marks omitted).  The benefit to defendants under
these programs is that they receive a shorter sentence, which is "accomplished either by
charge-bargaining or by [the prosecutor] promising to recommend a downward departure at
sentencing."  United States v. Morales-Chaires, 430 F.3d at 1127.   New Mexico is one of the
States that has a fast-track program.  See United States v. Sanchez-Juarez, 240 F. App'x 259, 262
n.2 (10th Cir. 2007)(unpublished)("In any event, Sanchez-Juarez was prosecuted in the United
States District court for the District of New Mexico, a jurisdiction that has a fast-track program
in place.").  New Mexico also has a fast-track program for certain drug cases.  See R. Norris,
Fast-Track Disparities in the Post-Booker World: Re-Examining Illegal Reentry Sentencing
Policies, 84 Wash. U. L. Rev. 747, 757 n.67 (2006)(noting that a fast-track program covers "drug
backpacking cases in New Mexico").
The United States Attorney General has since adopted a nationwide policy for
implementing the fast-track program in illegal re-entry cases.  See Memorandum from James M.
Cole, Deputy Attorney General, to the United States Attorneys at 2 (Jan. 31, 2012), available at
http://www.justice.gov/dag/fast-track-program.pdf ("Memorandum")("After consultation with
the United States Attorneys in both affected and non-affected districts, the Department is
revising its fast-track policy and establishing uniform, baseline eligibility requirements for any
defendant who qualifies for fast-track treatment, regardless of where that defendant is
prosecuted.").  The Attorney General stated that it would require certain "baseline eligibility
requirements" for a particular district to maintain such a fast-track program, including: (i) having
the United States Attorney in each district retain discretion to limit a defendant's participation in
the program in light of various factors, such as criminal history and number of illegal re-entries;
(ii) requiring a written plea agreement with certain provisions, such as an agreement to waive
appellate rights; and (iii) setting national standards regarding what levels of downward
departures are permitted under the program.  Memorandum at 2-4.

Court held a sentencing hearing on April 22, 2015, where it rejected the plea agreement, and told Corchado-Aguirre that, if he wanted to continue under his guilty plea, he would need to plead guilty again.  See Transcript of Sentencing Hearing (taken April 22, 2015)("Apr. 22 Tr.").[3] Corchado-Aguirre later pled guilty before the Honorable Karen B. Molzen, United States Magistrate Judge for the District of New Mexico.  See Plea Minute Sheet, filed May 29, 2015 (Doc. 21).  The Court held another sentencing hearing on July 16, 2015, where it sentenced Corchado-Aguirre to 16-months imprisonment.  See Transcript of Sentencing Hearing, filed July 30, 2015 (Doc. 29)("July 16 Tr.").

The Court will discuss the procedural background in three sections.  First, it will describe the PSR's sentencing Guidelines calculations.  Second, the Court will discuss the briefing filed before the April 22, 2015, sentencing hearing and the parties' arguments at the hearing.  Finally, the Court will discuss the briefing after the April 22, 2015, sentencing hearing and the parties' arguments at the July 16, 2015, sentencing hearing.

    1.    **The PSR and Addendum.**

The PSR notes that Corchado-Aguirre's base offense level is 8 and that an additional 4 levels are assessed under U.S.S.G. § 2L1.2(b)D, because he has previously been deported after to a felony conviction.  See PSR ¶¶ 9-10, at 4.  The PSR notes a 2-level reduction under U.S.S.G. § 3E1.1(a) for acceptance of responsibility.  See PSR ¶ 16, at 4.  It notes an additional 4-level reduction pursuant to the Plea Agreement, resulting in a total offense level of 6.  See PSR ¶ 17, at 4.

---

[3]The Court's citations to the transcripts of the April 22, 2015, hearing refer to the court reporter's original, unedited versions.  Any final versions may contain slightly different page and/or line numbers.

The PSR states that Corchado-Aguirre has four prior convictions.  First, on July 20, 2006, he was convicted in Del Rio, Texas, of illegal entry and received a 15-day sentence.  See PSR ¶ 20, at 4.  Second, on November 4, 2008, he was convicted in Las Cruces, New Mexico, of felony illegal entry without inspection and was sentenced by the Honorable Robert C. Brack, United States District Judge for the District of New Mexico, to 40-days imprisonment.  See PSR ¶ 21, at 5.  Third, he was convicted on March 25, 2010, in Del Rio, of illegal entry and was sentenced to 180-days imprisonment.  See PSR ¶ 22, at 5.  Fourth, he was convicted on March 8, 2013, in Del Rio, for illegal reentry and was sentenced to 15-months imprisonment and 3-years supervised release.  See PSR ¶ 23, at 5.  For this last conviction, the PSR notes that, while Corchado-Aguirre was represented by counsel, his counsel waived his appearance at the presentence interview.  See PSR ¶ 23, at 6.  The PSR states that Corchado-Aguirre had a documented mental health history, but that the severity of his condition was unknown at the time.  See PSR ¶ 23, at 6.  The PSR notes that the presentence report from the Western District of Texas states that Corchado-Aguirre assaulted a corrections officer "by throwing water/urine at the officer."  PSR ¶ 23, at 6 (internal quotation marks omitted).  According to the PSR, the probation officer in the Western District of Texas case did not offer Corchado-Aguirre a reduction for acceptance of responsibility, because of his conduct against the corrections officer.  See PSR ¶ 23, at 6.  The PSR states that it does not appear that Corchado-Aguirre's attorney in the previous case objected to the denial of the acceptance-of-responsibility reduction.  See PSR ¶ 23, at 6.

The PSR states that Corchado-Aguirre's past convictions result in 7 criminal history points.  See PSR ¶ 24, at 6.  It notes that, because Corchado-Aguirre committed the instant offense while under a criminal justice sentence, an additional two points are added under

U.S.S.G. § 4A1.1(d).  See PSR ¶ 24, at 6.  According to the PSR, a criminal history score of 9 establishes a criminal history category of IV.  See PSR ¶ 26, at 6.  The PSR states that a total offense level of 6 and a criminal history category IV establish a Guideline imprisonment range of 6 to 12 months.

In identifying factors that may warrant a departure, the PSR states that a downward departure under U.S.S.G. § 4A1.3(b) for an over-represented criminal history may be warranted.  See PSR ¶ 62, at 11.  It notes that Corchado-Aguirre's four prior offenses were all for immigration convictions and that he received an additional 2 criminal history points because he was under a criminal justice sentence -- the supervised release from the Western District of Texas case -- when he committed the offense at issue.  See PSR ¶ 62, at 11.  The PSR states that Corchado-Aguirre's criminal history is over represented and recommends that the Court apply a criminal history category III.  See PSR ¶ 62, at 11.  It states that a criminal history category III combined with an offense level of 6 establishes a Guideline range of 2- to 8-months imprisonment.  See PSR ¶ 62, at 11.

The USPO issued an addendum to the PSR on April 21, 2015.  See Addendum to the Presentence Report, disclosed April 21, 2015 ("Addendum").  The Addendum states that, although Corchado-Aguirre denied having any mental illness or emotional issues during the presentence interview in 2012, he admitted that he had attempted suicide before his 2012 arrest.  See Addendum at 1.  The Addendum also notes that, on March 12, 2015, during a visit with mental health services, Corchado-Aguirre indicated that he was agitated, paranoid, tense, restless, frightened, and constricted with rapid speech.  See Addendum at 1.  It states that Corchado-Aguirre told the counselor that he wanted to kill himself because he had a relationship with God.  See Addendum at 1.  The Addendum also states that Corchado-Aguirre has been

diagnosed with Psychotic Disorder NOS,[4] alcohol and cocaine abuse, and anti-social personality disorder traits and is considered to be a suicide risk.  See Addendum at 1.  The Addendum notes that Corchado-Aguirre is taking Risperidone to treat his symptoms.  See Addendum at 1.  It further notes that, during Corchado-Aguirre's initial mental health evaluation on January 11, 2015, he ended the evaluation early, because he was nervous from other inmates banging and making noise, which Corchado-Aguirre said was consistent with panic attacks and anxiety.  See Addendum at 2.

##  2.  The Briefing and Hearing Pursuant to the Plea Agreement.

On April 15, 2015, Corchado-Aguirre filed the Memo. I.  He requests that the Court sentence him to the low end of the range which the Plea Agreement permits, which is 6-months imprisonment.  See Memo. I at 1.  According to Corchado-Aguirre, he was prosecuted in Del Rio in 2012 for illegal reentry and, in that case, he pled guilty without a plea agreement.  See Memo. I at 1.  He disparages his attorney from that previous case by stating that the attorney "missed several issues," "did not attend the presentence report interview," "missed the fact that his client is mentally ill," and "failed to object in any way to the probation officer's denial of acceptance levels when [he] acted out consistently with his then untreated mental illness."  Memo. I at 1 (alterations omitted).  Corchado-Aguirre argues that, because he was denied a departure for an acceptance of responsibility, his offense level was 10, rather than 12, and his Guideline range was 15- to 21-months imprisonment, rather than 10- to 16-months imprisonment, or 2- to

---

[4]Psychotic Disorder NOS, or Not Otherwise Specified, is a category of psychotic disorders that "includes psychotic symptomatology (i.e., delusions, hallucinations, disorganized speech, grossly disorganized or catatonic behavior) about which there is inadequate information to make a specific diagnosis or about which there is contradictory information, or disorders with psychotic symptoms that do not meet the criteria for any specific psychotic disorder."  Psych Central Staff, Psychotic Disorder: Not Otherwise Specified (NOS), PsychCentral, http://psychcentral.com/disorders/psychotic-disorder-not-otherwise-specified-nos (last visited Aug. 21, 2015).

8-months imprisonment, which he would have received with a fast-track plea agreement.  See Memo. I at 2.

Corchado-Aguirre states that, once he reached a Bureau of Prisons ("BOP") facility, he was diagnosed with adjustment disorder, depression, and psychotic features, and that he was given medication to treat his mental illness.  See Memo. I at 2.  He asserts that, since being detained in the current case, his mental illness has been identified and that he has received treatment.  See Memo. I at 3-4.  Corchado-Aguirre argues that, if his counsel in his prior case had provided effective assistance, the attorney would have recognized his mental illness and would have objected to the failure to give an acceptance-of-responsibility reduction.  See Memo. I at 4-5.  He contends that erroneous prior confinement is an extraordinary circumstance that the United States Sentencing Commission did not contemplate.  See Memo. I at 5.

According to Corchado-Aguirre, if the Court were to deny the fast-track Plea Agreement, it would lead to disparate and unfair results.  See Memo. I at 5-6.   He asserts that, in February 15, 2012, the United States Attorney General established a nation-wide fast-track program, but that, even though he was arrested in 2012 in Texas, he was either not offered a fast track or  "his prior counsel, among other deficiencies, failed to accept a fast track offer."   Memo. I at 5.  Corchado-Aguirre argues that, because he was offered a fast-track Plea Agreement in this case, "to the extent that the Court might be inclined to compare a prior sentence to the one here, it would be an inapt comparison," because this case was "handled in conformity with the Attorney General's policy," while the previous one was not and had "serious deficiencies in legal representation and mental health treatment."  Memo. I at 5-6.

Corchado-Aguirre asserts that a 6-month sentence satisfies 18 U.S.C. § 3553's objectives. See Memo. I at 6.  He argues that the certainty of punishment is a much greater deterrent than the

severity of the punishment.  See Memo. I at 6-7.  He also argues that "the concept of deterrence assumes rational thinking, knowledge of and ability to evaluate outcomes, and thoughtful choices," which are not "necessarily applicable to a person who is illiterate, never went to school, and who suffers from an untreated delusional mental illness."  Memo. I at 8.  According to Corchado-Aguirre, because he does not have a violent background, he is not a danger to society.  See Memo. I at 8.  He contends that incarceration cannot be used as a means of rehabilitation and that he can receive out-patient treatment for his mental illness.  See Memo. I at 8-9.

Corchado-Aguirre maintains that the Western District of Texas case distorts his criminal history, because his mental illness resulted in a denial of an acceptance-of-responsibility reduction, and his attorney "failed to investigate his case or protest this wrongful denial of acceptance reduction."  Memo. I at 9.  He asserts that the Western District of Texas case wrongfully resulted in 5 criminal history points: 3 for the length of the sentence, which should be 2 points if he had been given an acceptance-of-responsibility reduction, and another 2 for violating supervised release.  See Memo. I at 9.

Corchado-Aguirre criticizes the Western District of Texas judge -- the Honorable Alia Moses, United States District Judge for the Western District of Texas -- for imposing supervised release:

> The fact that [Corchado-Aguirre] was on supervised release at all is quite possibly the result of the sentencing judge being wrongfully led to believe that this was an intentionally unrepentant person demonstrating contempt for authority, rather than an [sic] mentally ill individual, and that is what led her to impose a maximum term of supervised release.

Memo. I at 9.  Corchado-Aguirre asserts that the Sentencing Commission amended U.S.S.G. § 5D1.1 in 2011 to state that supervised release should ordinarily not be imposed on a deportable

alien.  See Memo. I at 9-10.  He argues that supervised release in the deportation context is inconsistent with the policies behind supervised release, which should be to reintroduce defendants into society, and not to doubly punish them for committing another reentry violation. See Memo. I at 10-11.  According to Corchado-Aguirre, "[m]ost offenders facing a second illegal reentry conviction would not face supervised release violation proceedings."  Memo. I at 11.

Six days later, the United States filed the United States' Sealed Sentencing Memorandum, filed April 21, 2015 (Doc. 16)("U.S. Memo.").  The United States asks the Court to disregard Corchado-Aguirre's allegations that his past sentence was unlawful or unjust, because the PSR does not give any indication that he received ineffective assistance of counsel or that he had been unjustly sentenced, because he has not sought a continuance of the sentencing hearing "to pursue a collateral attack against any past conviction or otherwise to seek a judicial determination that any past sentence . . . was unjust or the result of ineffective assistance," and because he has not notified the United States that he "seeks an evidentiary hearing . . . to attempt any form of collateral attack against a past judgment of sentence."  U.S. Memo. at 1.  The United States asserts that this is Corchado-Aguirre's fifth immigration offense and that, in his prior offenses, he received a 15-day sentence in 2006, a 40-day sentence in 2008, a 180-day sentence in 2010, and a 15-month sentence in 2012.  See U.S. Memo. at 1-2. According to the United States, while the Court should take into consideration Corchado-Aguirre's mental health issues, the Court should focus on § 3553(a)'s factors, which consider both general and specific deterrence, and not on Corchado-Aguirre's policy-driven deterrence argument.  See U.S. Memo. at 2.

The Court held a sentencing hearing on April 22, 2015.  The Court told the parties that it had a problem accepting the Plea Agreement, because Corchado-Aguirre has been deported so many times, and because the Plea Agreement's contemplated range -- 6- to 12-months imprisonment -- would not adequately reflect § 3553(a)'s factors, specifically deterrence.  See April 22 Tr. at 2:11-3:3 (Court).  The Court said that it was surprised Judge Moses initially did not transfer the violation case to New Mexico, which signals that Judge Moses is not happy with Corchado-Aguirre, does not trust him, and would give a harsh sentence for violating supervised release.  See April 22 Tr. at 3:12-4:4 (Converse, Court).  Corchado-Aguirre contended that Judge Moses was concerned about Corchado-Aguirre's mental health and transferred the case to the District of New Mexico so that the Court would impose the final sentence, rather than having an additional sentence in Texas for violating supervised release.  See April 22 Tr. at 4:10-6:12 (Converse, Court).

Corchado-Aguirre argued that the certainty of punishment is a greater deterrent than severity.  See April 22 Tr. at 6:13-17 (Converse).  He also argued that 6 months is a long sentence for a reentry violation, and that the deterrent philosophy that sentences need to be worse for each subsequent violation assumes that a person is capable of thinking in a logical and rational manner.  See April 22 Tr. at 6:24-7:7 (Converse).  Corchado-Aguirre contended that mental health treatment, and not incarceration, was the only way to help him think in a logical and rational way.  See April 22 Tr. at 7:12-21 (Converse, Court).  The Court asked if he was incompetent, and he said that he is competent.  See April 22 Tr. at 7:23-8:1 (Converse, Court).  Corchado-Aguirre said that he suffers from a delusional disorder, that he is being treated for it, and that, because his counsel is working with the Mexican consulate, he will continue to receive treatment after being released.  See April 22 Tr. at 8:5-20 (Converse).  He also repeated his

criticisms of his former counsel.  See April 22 Tr. at 8:24-9:8 (Converse); id. at 9:20-25 (Converse).

The United States said that it agrees that the Plea Agreement's range is an appropriate sentence, but that it does not agree with many of Corchado-Aguirre's criticisms of his prior counsel, because it is "criticizing people who are not in the room as George Washington warned . . . against in his book on courtesy."  April 22 Tr. at 10:9-17 (Mysliwiec).  The United States repeated its argument that there has been no judicial determination that Corchado-Aguirre was improperly represented in his prior case.  See April 22 Tr. at 10:17-21 (Mysliwiec).

The Court rejected the Plea Agreement, because it did not think the fast-track Plea Agreement's Guidelines range adequately reflected § 3553(a)'s factors.  See April 22 Tr. at 13:21-14:1 (Court).  Corchado-Aguirre told the Court that it would take some time for his counsel to communicate the effect of rejecting the Plea Agreement, so the Court told him that, if he wanted to continue the case under his guilty plea, he should plead guilty again.  See April 22 Tr. at 14:2-15:20 (Mysliwiec, Converse, Court).

**3.      The Second Sentencing Hearing.**

After pleading guilty before Judge Molzen, Corchado-Aguirre filed the Memo. II.  The Memo. II is, for the most part, identical to the Memo. I.  Compare Memo. I at 1-12, with Memo. II at 1-18.  The Court will, thus, state only the new arguments which Corchado-Aguirre raises in the Memo. II.

Corchado-Aguirre argues that the Western District of Texas conviction causes his criminal history to be overrepresented and that the Court should grant a downward departure to correct this overrepresentation.  See Memo. II at 5-6 (citing United States v. Huerta-Rodriguez, 355 F. Supp. 2d 1019, 1031 (D. Neb. 2005)(Bataillon, J.)).  For deterrence, he maintains that

- 12 -

deterrence as a penological theory assumes that defendants know the law, that the punishment can be structured in a manner that defendants will perceive its effect as outweighing the criminal action's immediate gain, and that defendants engage in rational decision making when choosing to engage in crime.  See Memo. II at 9.  Corchado-Aguirre also asserts that people usually do not know the law.  See Memo. II at 10.  He contends that deterrence is further undermined if a person is not a rational person.  See Memo. II at 11.  He states: "Therefore, while it is questionable that deterrence can provide justification for sentencing defendants in general, it certainly cannot justify imposing a harsh sentence in order to deter a person such as Mr. Corchado who is suffering from a mental illness."  Memo. II at 11.

Corchado-Aguirre attacks the retribution theory of punishment, which he describes as "the idea that a defendant caused a harm to society and deserves to be punished."  Memo. II at 12.  According to him, his criminal harm is limited to his illegal entry into the United States, which is only a minimal harm.  See Memo. II at 12.  Corchado-Aguirre directs the Court to Atkins v. Virginia, 536 U.S. 304, 320 (2002), to argue that the Supreme Court of the United States of America has acknowledged that mental illness reduces a defendant's culpability in the capital punishment context.  See Memo. II at 12-13.  He contends that his mental illness makes him less culpable than other defendants, causing the retributive framework to call for imposing a lighter sentence.  See Memo. II at 13.  Corchado-Aguirre maintains that a lengthy sentence would result in disparate treatment, because, in 2014, of the 3,254 defendants who were sentenced for immigration offenses, 2,909 received a sentence  of 12 months or less.  See Memo. II at 16.

Corchado-Aguirre attaches to the Memo. II an article from the National Institute of Justice which lists five things about deterrence.  See National Institute of Justice, Five Things

About Deterrence, United States Department of Justice, filed June 26, 2015 (Doc. 22)("Five

Things").  It states:

1.   **The certainty of being caught is a vastly more powerful deterrent than the punishment.**

Research shows clearly: If criminals think there's only a slim chance they will be caught, the severity of punishment -- even draconian punishment -- is an ineffective deterrent to crime.

2.   **Sending an offender to prison isn't a very effective way to deter crime.**

Prisons are good for punishing criminals and keeping them off the street, but prison sentences are unlikely to deter future crime.  Prisons actually may have the opposite effect: Inmates learn more effective crime strategies from each other, and time spent in prison may desensitize many to the threat of future imprisonment.

3.   **Police deter crime by increasing the perception that criminals will be caught and punished.**

The police deter crime when they do things that strengthen a criminal's perception of the certainty of being caught.  Strategies that use the police as "sentinels," such as hot spots policing, are particularly effective.

4.   **Increasing the severity of punishment does little to deter crime.**

Laws and policies designed to deter crime are ineffective partly because criminals know little about the sanctions for specific crimes.  Seeing a police officer with handcuffs and a radio is more likely to influence a criminal's behavior than passing a new law increasing penalties.

5.   **There is no proof that the death penalty deters criminals.**

According to the National Academy of Sciences, "Research on the deterrent effect of capital punishment is uninformative about whether capital punishment increases, decreases, or has no effect on homicide rates."

Five Things at 1 (emphasis omitted).  He also attaches to the Memo. II an article that states many

of the arguments he makes: that deterrence assumes rational thinkers, which most criminal

defendants are not; that the certainty of punishment is a greater deterrence than the severity; that

longer sentences increase recidivism rates; and that long sentences' economic costs on society are greater than their benefits.  See Valerie Wright, Ph.D., Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment, The Sentencing Project: Research and Advocacy for Reform (Nov. 2010), filed June 26, 2015 (Doc. 22).

The Court held a sentencing hearing on July 16, 2015.  The United States said that it does not object to USPO's downward variance from a criminal history category IV to III.  See July 16 Tr. at 4:3-24 (Mysliwiec, Court).  Corchado-Aguirre repeated his arguments that it would be unfair for the Court to sentence him to a greater sentence than he received in the Western District of Texas, because, if he had received a fast track in Texas, his sentence would have been 2- to 8-months imprisonment.  See July 16 Tr. at 4:17-25 (Converse).  He contended that his attorney failed to recognize his mental illness; that he threw tea, and not urine, at the correctional officer in Texas; that his mental illness caused him to throw the tea; and that, if Judge Moses had realized that the mental illness caused the tea-throwing incident, he would have received an acceptance-of-responsibility reduction.  See July 16 Tr. at 6:1-7:16 (Converse, Court).  Corchado-Aguirre repeated his arguments from the briefs concerning disparate impact, retribution, and deterrence.  See July 16 Tr. at 7:16-8:18 (Converse).

The United States argued that Corchado-Aguirre could not accept the facts in the PSR as true, decline to conduct an evidentiary hearing, and then argue that the facts in the PSR are wrong, specifically for the tea/urine throwing incident.  See July 16 Tr. at 9:18-10:6 (Mysliwiec).  It contended that the Court should rely on the Guidelines in calculating a sentence, but that the Court should consider the Texas court's 15-month sentence, because it shows that 15 months is not sufficient to deter Corchado-Aguirre from continually disrespecting the law.  See July 15 Tr. at 10:7-20 (Mysliwiec).  According to the United States, if the Court were to take Corchado-

Aguirre's arguments about deterrence and the lack of rational decision making to their logical conclusion, there would be no sentence that is sufficient to specifically deter him, meaning the Court would be free to impose a maximum sentence, because no lesser sentence would result in specific deterrence.  <u>See</u> July 15 Tr. at 11:20-12:11 (Mysliwiec).  The United States requested that the Court sentence Corchado-Aguirre to more than 15-months imprisonment.  <u>See</u> July 15 Tr. at 11:16-12:12 (Mysliwiec).

Corchado-Aguirre contended that he only admitted that the Western District of Texas presentence investigation report stated that he threw water or urine on the correction officer, and not that he in fact threw water or urine on the officer, and that it was his attorney in the Western District of Texas who should have objected to that fact in the Texas presentence report.  <u>See</u> July 15 Tr. at 12:18-13:14 (Converse).   The Court sentenced Corchado-Aguirre to 16-months imprisonment.  <u>See</u> July 15 Tr. at 19:4-7 (Court).  The Court explained its rationale as follows:

> The Court has considered the guidelines, but in arriving at its sentence, has taken into account not only the guidelines but other sentencing goals.  Specifically the Court has considered the guideline sentencing range established for the applicable category of offense committed by the applicable category of defendant. And the Court has basically read the presentence report for Mr. Corchado-Aguirre twice, in preparation for the last sentencing again today, as well as the sentencing memorandum that was prepared.  And while re-entry is not the most serious crime, there are other factors that I think -- such as promoting respect for the law and deterrence -- I do think that it's kind of hard to figure out what works with Mr. Corchado, to keep him back.   And avoiding unwarranted sentencing disparities, we can't use really supervised release in any meaningful way with Mr. Corchado.  So the Court believes that the punishment that's set forth in the guidelines is appropriate for this sort of offense.  To sentence him to basically six months, a few days, 22 or so days, would put him really back to sentences he's received a couple of times in this case.  And I do think that it would not be appropriate to sentence him to the same things he's received in the past.
>
> So I'm going to sentence at the high end of the guideline range.  I don't see any need to go any further above the guideline range.  I think this -- the guidelines here, I didn't feel comfortable with it, with the fast track; but I do think that the guidelines we've worked together to arrive at does produce a sentence at the high end that is adequate but necessary, as well, to reflect the seriousness of

the offense and promote respect for the law.  I think that's an important factor here.  I think providing a just punishment also supports this, and affording an adequate deterrence at both a specific and general level.  He's not committing any other crimes, so I don't think we need to emphasize protecting the public, but I do think a guideline sentence avoids unwarranted sentencing disparity among defendants with similar records who have been found guilty of similar conduct.  And because he will be deported after he serves this sentence, I think it fully and effectively reflects each of the relevant factors in 18 U.S.C. section 3553(a).

I'll indicate again what I think I indicated at the last sentence.  In 2006 he received 15 days from the Western District of Texas.  And then Brack in 2008 gave him 40 days.  And I think then the Western District of Texas began to see him as this not working, so they gave him 180 days in 2010 and then 15 months in 2012.

And regardless of what he tossed on the officer, I think probably the Court did not feel in the Western District of Texas that was proper conduct for the Defendant to be engaging in while he was incarcerated.

Also, he was deported in 2008, '14, and '13, so I think he's going to be looking at greater sentences if he doesn't realize he shouldn't come to the United States.

I certainly read all the material on his mental health history, but you know, he's competent, and I've been with Mr. Corchado-Aguirre a couple of times now.  He seems to understand what we're doing here in the courtroom, and he's just going to have to, I think, realize that he can't come back into the United States.

We've tried to mitigate the criminal history.  I agree with Mr. Mysliwiec what we're really working with is a base level of 15 months.  I mean, regardless of how he got there and what the lawyer did in that case in the Western District of Texas, the judge there gave him 15 months, and that doesn't seem to deter Mr. Corchado-Aguirre.  And so I don't think returning to something below that would be appropriate here.

So I think this sentence is reasonable, I think the guidelines suggest a reasonable sentence, and I think one that stays within that, but is at the high end of the range is sufficient without being greater than is necessary to comply with the purposes of punishment set forth in the Sentencing Reform Act.

July 17 Tr. at 15:17-19:3 (Court).  The Court then addressed the violation issue by sentencing

Corchado-Aguirre to 8-months imprisonment, with 7 months to run concurrently with the

16-month sentence, and 1 month to run consecutively.  See Transcript of Hearing on Violation of

Supervised Release at 17:21-24 (dated April 22, 2015)(Court).

### LAW REGARDING THE UNITED STATES SENTENCING GUIDELINES

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court severed the

mandatory provisions from the Sentencing Reform Act of 1984, Pub. L. No. 98-473, 98 Stat.

1837, thus making the Guidelines sentencing ranges effectively advisory.  See 543 U.S. at 245.

In excising the two sections, the Supreme Court left the remainder of the Act intact, including 18

U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide

sentencing.  Those factors in turn will guide appellate courts, as they have in the past, in

determining whether a sentence is unreasonable."  543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater

than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C.

§ 3553(a)(2):

> **(A)**      to reflect the seriousness of the offense, to promote respect for the law,
>             and to provide just punishment for the offense;
>
> **(B)**      to afford adequate deterrence to criminal conduct;
>
> **(C)**      to protect the public from further crimes of the defendant; and
>
> **(D)**      to provide the defendant with needed educational or vocational training,
>             medical care, or other correctional treatment in the most effective
>             manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

> [A] defendant who has been found guilty of an offense described in any Federal
> statute . . . shall be sentenced in accordance with the provisions of this chapter so
> as to achieve the purposes set forth in subparagraphs (A) through (D) of section
> 3553(a)(2) to the extent that they are applicable in light of all the circumstances of
> the case.

18 U.S.C. § 3551.  To achieve these purposes, 18 U.S.C. § 3553(a) directs sentencing courts to consider: (i) the Guidelines; (ii) the nature of the offense and the defendant's character; (iii) the available sentences; (iv) a policy favoring uniformity in sentences for defendants who commit similar crimes; and (v) the need to provide restitution to victims.  See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines ranges are no longer mandatory, both the Supreme Court and the United States Court of Appeals for the Tenth Circuit have clarified that, while the Guidelines ranges are one of several factors that 18 U.S.C. § 3553(a) enumerates, they are entitled to considerable deference.  See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many"), overruled on other grounds by Gall v. United States, 525 U.S. 38 (2007), as recognized in United States v. White, 265 F. App'x 719, 728 n.8 (10th Cir. 2008)(unpublished).  They are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses."  United States v. Cage, 451 F.3d at 593 (internal quotation marks omitted).  A reasonable sentence is one that also "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  See United States v. Booker, 543 U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable." United States v. Terrell, 445 F.3d 1261, 1264 (10th Cir. 2006), overruled on other grounds by Rita v. United States, 551 U.S. 338, 349 (2007), as recognized in United States v. Zamora-Solorzano, 528 F.3d 1247, 1251 n.3 (10th Cir. 2008). This presumption, however, is an appellate presumption, and not one that the trial court can or should apply. See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S. at 46-47; Kimbrough v. United States, 552 U.S. 85, 90-91 (2007). Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption in favor of the advisory[5] Guidelines sentence. See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S. at 46-47; Kimbrough v. United States, 552 U.S. at 90-91.

---

[5]Attorneys and courts often say that the "Guidelines" are advisory, but it appears more appropriate to say that the Guideline ranges are advisory. Gall v. United States, 522 U.S. at 46 ("As a result of our decision [in United States v. Booker], the Guidelines are now advisory[.]"); United States v. Leroy, 298 F. App'x 711, 712 (10th Cir. 2008)(unpublished)("[T]he Guidelines are advisory, not mandatory."); United States v. Sells, 541 F.3d 1227, 1237 (10th Cir. 2008)("[T]he sentence ultimately imposed by the district court was based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a) factors, and an understanding that the Guidelines are advisory."). The Court must consider the Guidelines, see Gall v. United States, 522 U.S. at 46 ("It is . . . clear that a district judge must give serious consideration to the extent of any departure from the Guidelines . . . ."), and must accurately calculate the Guidelines range, see Gall v. United States, 522 U.S. at 49 ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."). The Court is not mandated, however, to apply a sentence within the calculated Guidelines range. See United States v. Sierra-Castillo, 405 F.3d 932, 936 n.2 (10th Cir. 2005)("[D]istrict courts post-Booker have discretion to assign sentences outside of the Guidelines-authorized range . . . ."). Accord United States v. Chavez-Rodarte, No. CR 08-2499 JB, 2010 WL 3075285, at *2-3 (D.N.M. July 16, 2010)(Browning, J.).

The Court must adhere to the following three-step sequence when sentencing a criminal defendant: first, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-contemplated departures based on parts 5H and 5K; and, only then, varying from the Guidelines framework on the basis of the § 3553(a) factors taken as a whole. The Court must follow this sequence, because: (i) the Guidelines expressly provide for it, and courts must still consult the Guidelines, even if they will

> While the Supreme Court's decision in United States v. Booker has given the sentencing court discretion that it did not have earlier, the sentencing court's first task remains to accurately and correctly determine the advisory-guideline sentence. Thus, before the sentencing court takes up a defendant's Booker arguments, the sentencing court must first determine whether the defendant is entitled to downward departures. The sentencing court may, however, also use these same departure factors in the Booker calculus, even if the court does not grant a downward departure.

United States v. Apodaca-Leyva, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. Feb.

13, 2008)(Browning, J.). The Supreme Court recognized, however, that the sentencing judge is

"in a superior position to find facts and judge their import under § 3553(a) in each particular

case." Kimbrough v. United States, 552 U.S. at 89. Applying § 3553(a)'s factors, the Court has

---

subsequently vary from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C. § 3553(e).

. . . .

The Supreme Court held in United States v. Booker that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing," 543 U.S. at 264, but further expounded in Kimbrough v. United States that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," 552 U.S. 85, 101 (2007)(alteration in original)(internal quotation marks omitted). In theory, this freedom could mean that a district court may excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in variances, and never even know what sentence a true, rigid Guidelines application would yield. In practice, however, appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their United States v. Booker-granted authority to post-Guidelines analysis "variances." Irizarry v. United States, 553 U.S. 708, 710-16 (2008). A district court that attempts to vary from U.S.S.G. § 1B1.1's basic sequence most likely acts procedurally unreasonably. See Gall v. United States, 552 U.S. 38, 51 (2007)(holding that a sentence is procedurally reasonable if "the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence" (emphasis added)).

United States v. Nolf, No. CR 10-1919-002, 2014 WL 3377695, at *20-21 (D.N.M. June 20, 2014)(Browning, J.)(emphasis in original).

- 21 -

found that the case of an illegal immigrant who re-enters the United States to provide for his two children and two siblings was not materially differentiated from other re-entry cases, and, thus, no variance from the Guidelines sentence was warranted. See United States v. Alemendares-Soto, No. CR 10-1922 JB, 2010 WL 5476767, at *12 (D.N.M. Dec. 14, 2010) (Browning, J.). On the other hand, in United States v. Jager, No. CR 10-1531 JB, 2011 WL 831279 (D.N.M. Feb. 17, 2011)(Browning, J.), although the defendant's military service was not present to an unusual degree and, thus, did not warrant a departure, the Court found that a variance was appropriate, because the defendant's military service was "superior and uniformly outstanding," as the defendant appeared to have been "trustworthy[] and dedicated, and he served with distinction." 2011 WL 831279, at *14. Similarly, in United States v. Enriquez-Ramirez, No. CR. 09-2441 JB, 2009 WL 5220463 (D.N.M. Dec. 11, 2009) (Browning, J.), in sentencing the defendant for illegal reentry, the Court refused to depart downward because of his cultural assimilation into American culture, but the Court varied downward, because of the amount of time the defendant spent in the United States, his strong family ties in the United States, the young age at which the defendant came to the United States, and his schooling in the United States. See 2009 WL 5220463, at *2-3.

## LAW REGARDING DOWNWARD DEPARTURES

The Guidelines "place essentially no limit on the number of potential factors that may warrant a departure." Koon v. United States, 518 U.S. 81, 106 (1996). See United States v. Coleman, 188 F.3d 354, 358 (6th Cir. 1999)(en banc)(stating that there are a "potentially infinite number of factors which may warrant a departure"); 18 U.S.C. § 3661 (stating that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider

for the purpose of imposing an appropriate sentence"). A departure is warranted if the case is "unusual enough for it to fall outside the heartland of cases in the Guideline." Koon v. United States, 518 U.S. at 92. Accord United States v. Lewellen, No. CR 11-1524 JB, 2012 WL 2175769, at *5 (D.N.M. June 5, 2012)(Browning, J.).

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue. We do not understand it to have been the congressional purpose to withdraw all sentencing discretion from the United States district judge.

Koon v. United States, 518 U.S. at 113.

## ANALYSIS

The Court will sentence Corchado-Aguirre to 16-months imprisonment. The Court will reject the Plea Agreement, because the resulting sentence does not adequately reflect § 3553(a)'s factors. The Court will not depart downward on the basis of Corchado-Aguirre's mental illness, because his case is not outside of the heartland of cases, and because he has failed to show that his attorney in his prior case provided ineffective assistance of counsel. The PSR, however, over represents Corchado-Aguirre's criminal history category. Consequently, the Court will depart downward from a criminal history category of IV to a category of III. Finally, the Court will sentence Corchado-Aguirre to 16-months imprisonment.

## I.   THE COURT WILL REJECT THE PLEA AGREEMENT.

The Court will reject the Plea Agreement. "Because sentencing is within the exclusive purview of the district court, the court has a wide range of discretion to either accept or reject sentence bargains, as contemplated by Rule 11(c)(1)(B) and (C)."   United States v.

Macias-Gonzalez, 219 F. App'x 814, 817 (10th Cir. 2007)(unpublished)[6](citing United States v. Robertson, 45 F.3d 1423, 1437 (10th Cir. 1995)("While Rule 11 vests district courts with the discretion to accept or reject plea agreements, the rule does not define the criteria to be applied in doing so.  On the contrary, so long as district courts exercise sound judicial discretion in rejecting a tendered plea, Rule 11 is not violated."  (citation omitted))).  Rule 11(c)(3)(A) gives the Court the authority to reject plea agreements that are made pursuant to rule 11(c)(1)(C).  See Fed. R. Crim. P. 11(c)(3)(A) ("To the extent the plea agreement is of the type specified in Rule 11(c)(1)(A) or (C), the court may accept the agreement, reject it, or defer a decision until the court has reviewed the presentence report.").  "'Rule 11(c)(1)(C) permits the defendant and the prosecutor to agree that a specific sentence is appropriate, but that agreement does not discharge the district court's independent obligation to exercise its discretion,' which includes the court's obligation to examine the sentence's sufficiency in light of 18 U.S.C. § 3553(a)."  United States v. LaPoint, 16 F. Supp. 3d 1006, 1008-09 (N.D. Iowa 2014)(Bennett, J.)(quoting Freeman v. United States, 131 S. Ct. 2685, 2692 (2011)).  The Court concludes that the Plea Agreement does not adequately reflect, at least some of, § 3553(a)'s sentencing factors, specifically the need to

---

[6]United States v. Macias-Gonzalez is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court finds that United State v. Macias-Gonzalez and United States v. Livingston, 490 F. App'x 153 (10th Cir. 2012)(unpublished), have persuasive value with respect to material issues, and will assist the Court in its preparation of this Memorandum Opinion.

promote respect for the law, to provide just punishment for the offense, and to afford adequate deterrence to criminal conduct.[7]

The Plea Agreement's resulting sentence does not adequately promote respect for the law. This is Corchado-Aguirre's fifth immigration offense. Sentencing a defendant to 6-months imprisonment for his fifth offense does not adequately respect the law. Instead, such a low sentence sends the message to Corchado-Aguirre and to society that continuously disregarding the United States' immigration laws is not a big deal.

Corchado-Aguirre does not specifically address the need to promote respect for the law, but his arguments about his mental health can be fairly construed as affecting the respect-for-the-law factor. He contends that, because of his mental condition, he is incapable of "rational thinking" and "thoughtful outcomes." Memo. I at 8. He has not, however, argued that his mental condition prevented him from establishing the necessary mens rea for his offense. Cf. United States v. Suazo-Martinez, 33 F. App'x 668, 670 (4th Cir. 2002)(unpublished)(describing mens rea for illegal reentry as "acting willfully and knowingly in reentering the United States"); United States v. Aranda-Diaz, No. CR 12-2686 JB, 2013 WL 4446946, at *7 (D.N.M. July 18, 2013)(Browning, J.)(describing the mens rea for reentry as having "the general intent to re-enter the United States"). To the contrary, by attempting to hide from the Border Patrol agents, see PSR ¶ 5, at 3, Corchado-Aguirre indicated that he knew that his actions were wrong. He has also not argued that he is incompetent. Instead, at the April 22, 2015, hearing, he admitted that he is competent. See April 22 Tr. at 7:23-8:1 (Converse, Court).

_____

[7]Because Corchado-Aguirre had filed only the Memo. I, and not the Memo. II, before the Court rejected the Plea Agreement at the April 22, 2015, hearing, the Court will address solely the Memo. I in explaining its rationale for rejecting the Plea Agreement.

Mental illness, by itself, may not be sufficient to warrant a lower sentence.  The sad fact is that a large number of the criminal defendants who appear before the Court suffer from mental illnesses.  The prevalence of mental illness in the criminal justice system is not unique to the District of New Mexico.

> The prevalence of mental disorders among persons with criminal justice system involvement is staggering.  Each year about 700,000 adults with serious mental illness come into contact with the criminal justice system.  Justice Department statistics indicate that sixteen percent of jail and prison inmates have a serious mental illness, but these estimates rise to 35% when they include less serious disorders.  About 70% of those admitted to correctional facilities have active symptoms of serious mental illness, making the Los Angeles, Cook County (Chicago and surrounding suburbs), and Rikers Island (New York City) jails the largest mental hospitals in the country.  Indeed, a recent study in Michigan found that 31% of its prison population required psychiatric care.  The largest study to date, sampling 3,332 inmates in New York prisons, found that 80% had severe disorders requiring treatment and another 16% had mental disorders requiring periodic mental health services.

Richard E. Redding, Why It Is Essential to Teach About Mental Health Issues in Criminal Law (and A Primer on How to Do It), 14 Wash. U. J.L. & Pol'y 407, 408-09 (2004).  Specifically, the Court has encountered many undocumented aliens with mental health problems.  See, e.g., United States v. Velazco-Barraza, No. CR 10-2217 JB, 2013 WL 311843 (D.N.M. Jan. 11, 2013)(Browning, J.); United States v. Valdez-Flores, No. CR 11-2367 JB, 2012 WL 2384103 (D.N.M. June 12, 2012)(Browning, J.); United States v. Manzanares-Sanabria, 814 F. Supp. 2d 1155 (D.N.M. 2011)(Browning, J.).

If the Court were to give substantially lower sentences to every criminal defendant who, despite having the requisite mens rea and being competent, suffered from some mental illness, the Court would have to sentence a substantial portion of criminal defendants to much lower sentences.  Such broad reductions in sentences severely undermine respect for the law, because a large portion of law breakers would no longer be punished for breaking the law.  This reality is

not to say that, if a defendants' mental condition were so severe that it fell outside the heartland of cases, it would not depart from the Guidelines range. See United States v. Allen, 250 F. Supp. 2d 317, 320-21 (S.D.N.Y. 2003)(Scheindlin, J.)("Nonetheless, defendant's limited mental capacity, especially his immaturity, does take his case outside the heartland of drug and gun distribution cases.").   The Court has also often used mental health to justify a variance.   See United States v. Lovato, 798 F. Supp. 2d 1257, 1259-60 (D.N.M. 2011)(Browning, J.)(varying downward because of defendant's mental conditions); United States v. Marcellus, No. CR 10-3452 JB, 2012 WL 4949369, at *3 (D.N.M. Sept. 5, 2012)(Browning, J.)(using defendant's mental health issues as a factor in deciding to vary downwards); United States v. Yazzie, No. CR 10-1761 JB, 2014 WL 1948244, at *16-17 (D.N.M May 7, 2014)(Browning, J.)(using defendant's mental condition as one factor in deciding to depart downward).   Granting a less-than-Guidelines sentence solely because of mental illness may not, however, show proper respect for the law.   Cf. United States v. Olvera, No. CR 09-0300, No. CIV 11-1740, 2013 WL 2289961, at *7 (S.D. Tex. May 22, 2013)(adopting the Magistrate Judge's recommendation to not vary, because defendant's mental illness was within the heartland of Guidelines cases).

Corchado-Aguirre spends a lot of time addressing the deterrence factor.  Some of the arguments in his brief may be more appropriate for a letter to a sitting congressperson than for a brief filed in district court to assist the trial judge in sentencing a specific defendant.  As the People's elected representatives, Congress has directed the Court to consider, among other things, "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct."  18 U.S.C. § 3553(a)(2).  Deterrence includes both general deterrence -- the sentence should deter others generally from committing similar crimes -- and specific deterrence -- the

sentence should deter the defendant from committing future crimes.[8]   See, e.g., United States v.

Edwards, 595 F.3d 1004, 1021 (9th Cir. 2010)(Pregerson, J., joined by Smith, J.)("Deterrence

---

[8]It is unclear whether specific deterrence falls under § 3553(a)'s factor that a sentence should "afford adequate deterrence to criminal conduct" or that a sentence should "protect the public from further crimes of the defendant."  18 U.S.C. § 3553(a)(2).  The United States Court of Appeals for the Ninth Circuit holds that the "afford adequate deterrence" factor in § 3553(a)(2)(B) includes only general deterrence, while the "protect the public from further crimes of the defendant" factor from § 3553(a)(2)(C) encompasses specific deterrence.

> The sentencing court must consider "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct."  18 U.S.C. § 3553(a)(2)(B).  Deterrence encompasses both general deterrence and specific deterrence.  However, specific deterrence is also considered under § 3553(a)(2)(C), which requires the district court to consider "the need for the sentence imposed . . . to protect the public from further crimes of the defendant."  Id. § 3553(a)(2)(C).  Thus, when a district court considers § 3553(a)(2)(B), it should focus on whether a sentence will provide general deterrence.  See United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006)(explaining that § 3553(a)(2)(B) speaks to general deterrence while § 3553(a)(2)(C) speaks to specific deterrence).

United States v. Edwards, 595 F.3d 1004, 1021 (9th Cir. 2010)(Pregerson, J., joined by Smith). The United States Courts of Appeals for the Seventh and Eleventh Circuits similarly hold that specific deterrence is found in § 3553(a)(2)(C).  See United States v. Irey, 612 F.3d 1160, 1227 (11th Cir. 2010)(en banc)(Carnes, J., joined by Dubina, C.J, and Black, Hull, Marcus, Wilson, Pryor, & Martin, JJ.)("The fourth factor . . . is 'the need for the sentence imposed to protect the public from further crimes of the defendant.'  This is the specific deterrence or incapacitation factor."  (alterations omitted)); United States v. McIlrath, 512 F.3d 421, 424 (7th Cir. 2008) (Posner, J., joined by Wood & Williams, JJ.)("[T]he second [factor goes] to specific deterrence (to protect the public from further crimes by this defendant)."  (emphasis in original)).  The United States Court of Appeals for the Second Circuit, on the other hand, has indicated that specific deterrence falls within § 3553(a)(2)(B).  See United States v. Broxmeyer, 699 F.3d 265, 295 (2d Cir. 2012)(Raggi, J., joined by Winter, J.)(citing § 3553(a)(2)(B) to support the statement that the defendant's lack of remorse created "a circumstance that further expanded the range of substantively reasonable sentences to allow the district court to afford adequate specific deterrence").   Similarly, despite earlier stating that specific deterrence falls within § 3553(a)(2)(C), in an unpublished opinion, the Seventh Circuit cited § 3553(a)(2)(B) when discussing specific deterrence.   See United States v. Brooks, 590 F. App'x 628, 629 (7th Cir. 2014)(unpublished)(Cudahy, Kanne, & Williams, JJ.).

The Supreme Court has indicated that § 3553(a)(2)(C) concerns incapacitation -- i.e., keeping the defendant off the streets to protect society from the defendant.  In Tapia v. United States, 131 S. Ct. 2382 (2011), the Supreme Court quoted § 3553(a)(2)'s factors, and then summarized them as "retribution, deterrence, incapacitation, and rehabilitation."  131 S. Ct. at 2387.  Thus, the need "to reflect the seriousness of the offense, to promote respect for the law,

encompasses both general deterrence and specific deterrence."); United States v. Luna-Jasso, No. CR 14-3523, 2015 WL 1006390, at *15 (D.N.M. Feb. 19, 2015)(Browning, J.)("The Court distinguishes general deterrence -- the effect that a sentence has on deterring people other than the defendant from committing the crime -- from specific deterrence -- the effect that the sentence has on deterring the defendant from recidivating.").

Corchado-Aguirre cites the Five Things article in the Memo. I, which he attaches to the Memo. II, to argue that "certainty, rather than severity, is a more effective deterrent, and that sending an offender to prison isn't a very effective way to deter crime." Memo. I at 6. The Court has previously addressed this article in an opinion from a prior case in which Corchado-Aguirre's counsel represented the defendant.

The pamphlet states:

> 1. **The certainty of being caught is a vastly more powerful deterrent than the punishment.** Research shows clearly: If criminals think there's only a slim chance they will be caught, the severity of punishment -- even draconian punishment -- is an ineffective deterrent to crime.

---

and to provide just punishment for the offense," 18 U.S.C. § 3553(a)(2)(A), concerns retribution; the need "to afford adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2)(B), concerns deterrence; the need "to protect the public from further crimes of the defendant," 18 U.S.C. § 3553(a)(2)(C), concerns incapacitation; and the need "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner," 18 U.S.C. § 3553(a)(2)(D), concerns rehabilitation.

The Court believes that specific deterrence is a better fit within § 3553(a)(2)(B) than § 3553(a)(2)(C). As the Supreme Court noted, § 3553(a)(2)(C) concerns incapacitation, rather than specific deterrence. Moreover, § 3553(a)(2)(B)'s reference to deterrence does not say that it is limited to general deterrence. While specific deterrence will further § 3553(a)(2)(C)'s goals as well as § 3553(a)(2)(B)'s goals, because specific deterrence will protect the public from future crimes by the defendant by deterring the defendant from committing future crimes, it is still a better fit within § 3553(a)(2)(B). The difference whether specific deterrence fits better within § 3553(a)(2)(B) or § 3553(a)(2)(C), however, is academic. Regardless which subsection specific deterrence falls within, § 3553(a)(2) requires the Court to consider specific deterrence when sentencing criminal defendants.

2.    **Sending an offender to prison isn't a very effective way to deter crime.**  Prisons are good for punishing criminals and keeping them off the street, but prison sentences are unlikely to deter future crime.  Prisons actually may have the opposite effect: Inmates learn more effective crime strategies from each other, and time spent in prison may desensitize many to the threat of future imprisonment.

3.    **Police deter crime by increasing the perception that criminals will be caught and punished.**  The police deter crime when they do things that strengthen a criminal's perception of the certainty of being caught.  Strategies that use the police as "sentinels," such as hot spots policing, are particularly effective.

4.    **Increasing the severity of punishment does little to deter crime.**  Laws and policies designed to deter crime are ineffective partly because criminals know little about the sanctions for specific crimes.  Seeing a police officer with handcuffs and a radio is more likely to influence a criminal's behavior than passing a new law increasing penalties.

5.    **There is no proof that the death penalty deters criminals.**  According to the National Academy of Sciences, "Research on the deterrent effect of capital punishment is uninformative about whether capital punishment increases, decreases, or has no effect on homicide rates."

Five Things at 1.

It should first be noted that this list does not represent the DOJ's views or opinions, as the pamphlet states that the "[f]indings and conclusions of the research reported here are those of the authors and do not necessarily reflect the official position or policies of the U.S. Department of Justice."  Five Things at 1. In any case, the Court generally agrees with the first four points, but still concludes that a longer sentence has some deterrence value that warrants a Guidelines sentence.  The Court has previously noted that the certainty of being caught is a greater deterrence than the severity of the punishment and that incarceration increases recidivism rates.  The Court, however, concluded that the severity of a punishment still has a general deterrence effect, even if it is not as great of a deterrence as the certainty of being caught.

The Court distinguishes general deterrence -- the effect that a sentence has on deterring people other than the defendant from

committing the crime -- from specific deterrence -- the effect that the sentence has on deterring the defendant from recidivating. The weight of the research indicates that incarceration -- imposing it at all or increasing the amount imposed -- either has no significant correlation to recidivism or <u>increases</u> the defendant's likelihood to recidivate. <u>See</u>, <u>e.g.</u>, Lin Song & Roxanne Lieb, <u>Recidivism: The Effect of Incarceration and Length of Time Served</u> 4-6, Wash. St. Inst. for Pub. Pol'y (Sept. 1993), <u>available at</u> http://wsipp.wa.gov/ ReportFile/1152/Wsipp_Recidivism-The-Effect-of-Incarceration-and-Length-of-Time-Served_Full-Report.pdf       (summarizing available studies on the correlation between incarceration and recidivism); T. Bartell & L.T. Winfree, <u>Recidivist Impacts of Differential Sentencing Practices for Burglary Offenders</u>, 15 Criminology 387 (1977)(outlining the results of a New Mexico-based study and concluding that offenders placed on probation were less likely to be reconvicted than similarly situated offenders who were incarcerated); D.M. Gottfredson, M.G. Neithercutt, J. Nuttfield & V. O'Leary, <u>Four Thousand Lifetimes: A Study of Time Served and Parole Outcomes</u>, Nat'l Council on Crime & Delinquency (1973)(outlining the results of a study of over 100,000 male parolees and finding that similarly situated offenders who served longer periods of incarceration were more likely to recidivate than those who received shorter periods of incarceration); T. Orsagh & J.R. Chen, <u>The Effect of Time Served on Recidivism: An Interdisciplinary Theory</u>, 4 J. Quant. Criminology 155 (1988)(concluding that similarly situated robbery convicts' recidivism rates rose with rising length of incarceration, while burglars and some other criminals had a "sweet spot" length of incarceration -- 1.2 to 1.3 years for younger offenders and 1.8 years for older offenders -- deviations from which increased recidivism). This trend obtains even for white-collar criminals. <u>See</u> David Weisburd et al., <u>Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes</u>, 33 Criminology 587 (1995). Thus, specific deterrence is a suspect ground for increasing incarceration, except insofar as the offender will be prevented -- though not "deterred" in the usual sense -- from committing additional crimes <u>while in custody</u> for the longer time period. This concept, however, is distinct; it is referred to as incapacitation, and academics do not usually consider it to be a subcategory of specific deterrence. Professor Daniel Nagin explains:

> The distinction between incapacitation and deterrence is also important for policy. Crime prevention by incapacitation necessarily requires higher imprisonment rates and the attendant social

costs.  By contrast, if crime can be deterred from occurring in the first place, there is no perpetrator to punish.  As a consequence, crime prevention by deterrence does not necessarily involve a trade-off between crime rates and imprisonment rates.

Daniel S. Nagin, <u>Deterrence: A Review of the Evidence by a Criminologist for Economics</u>, 2013 Annual Rev. Econ. 5:83, 84.  Both specific deterrence and incapacitation are, of course, valid considerations in sentencing, and the difference between the two may be more important to academics than to courts.  Courts are bound to impose sentences consistent with 18 U.S.C. § 3553(a), and both considerations -- specific deterrence and incapacitation -- are reflected in the same two § 3553(a) factors: (a)(2)(B)'s mandate "to afford adequate deterrence to criminal conduct" and (a)(2)(C)'s mandate "to protect the public from further crimes of the defendant."  The Court concludes that specific deterrence is embodied more by (a)(2)(B) than (a)(2)(C), while incapacitation is embodied more by (a)(2)(C) than (a)(2)(B), but both statutory provisions support both considerations, and if Congress did not care to separate them, the Court must address them both when sentencing a defendant.  Thus, the Court must still consider specific deterrence when sentencing, because Congress demands it; prevailing research simply indicates that alternatives to incarceration are generally more effective on this front.

There is, however, comparatively more support for incarceration's general-deterrence value.  An economic model of crime would have individuals committing crimes only when the benefit to the individual of committing the crime ($f$, for "fruits") outweighs the product of the likelihood of getting caught and brought to justice ($c$, for "certainty") multiplied by the detrimental impact of the punishment on the individual ($s$, for "severity").  If $f > c \bullet s$, the individual will commit the crime, and if $f < c \bullet s$, the individual will not commit the crime.  The Court notes that this theory is not fully workable as written; several factors -- many of which would vary from person to person -- would need to be established.  For example, $s$ and $f$ would have to be put into the same units.  Commonly, $s$, the punishment for a crime, starts out in units of months of incarceration; $f$, the crime's benefit to the criminal, often starts out in units of dollars.  A conversion factor would have to be established that essentially asks how much an individual would have to be paid to spend a month in prison.  This conversion factor would likely vary from person to person, both on the basis of idiosyncratic personal preferences and for rational, predictable reasons, <u>e.g.</u>, an 80-year-old man with millions of

dollars might be less apt to trade prison time for money than a 30-year-old without a cent to his name.  Even a single person likely has more than one conversion factor, which marginally fluctuates over the number of months of incarceration involved; for example, there are often immense social and reputational costs to a person for serving his or her first month in prison -- i.e., for being convicted and incarcerated at all -- but these costs are for the most part one-time-only, and do not double or triple upon serving two or three months in prison.  The model would also have to account for: (i) the possibility of being arrested but not convicted, which might entail social and reputational costs, and even some jail time; (ii) the possibility of being suspected but not arrested, which may entail social and reputation costs; and (iii) the uncertainty, at the time the crime is committed, of what the exact punishment will be if convicted.  These "intermediate" outcomes -- between the polar outcomes of being convicted, on one hand, and getting away scot free, on the other -- necessitate transforming the right-hand side of the model formula into an integral, in which the various possible outcomes are assigned a probability, their detrimental impact multiplied by that probability, and each possible outcome's consequent product added together to obtain a final sum, which represents $c \cdot s$.  Analogous issues exist on the left-hand side of the formula -- the expected value of committing the crime.  It is often not clear before committing the crime how much money -- or other non-monetary benefit, which can then be assigned a monetary equivalent -- will be earned by committing the crime, and, thus, the various possibilities and their corresponding likelihoods must be integrated.

None of these snags is fatal to the economic model; they just make the model's inputs difficult to obtain, and, in some cases, practically unknowable.  The model is theoretically sound, and accurately describes how an informed, rational actor would treat the decision whether to commit a crime.  Even though most criminals are not, themselves, "informed, rational actors," one would expect that their behavior would, on average, reflect the rational pursuit of incentives, i.e., individuals who should not rationally commit crimes will commit them at roughly the same rate that individuals who "should" rationally commit crimes refrain from committing them, and thus the irrationalities in both directions cancel out, resulting in net rational behavior.  Thus, under the economic model, all Congress has to do to root out crime is to ensure that the crime's punishment and detection rate are sufficiently high to greatly outweigh the average fruits of the crime.  This end can be effectuated equally well with either severity of punishment or certainty of detection, as a proportional

increase to either has the same effect on the right side of the equation.

The model, however, does not work in the real world; it has been falsified by empirical research. The model is dead, and facts, not theory, killed it. If the model held true in the real world, doubling the punishment severity of a crime would deter the same portion of potential criminals as doubling the certainty of detection, and halving a crime's punishment would galvanize the same number of new criminals and halving the detection rate. For example, consider a crime with a certainty of 20% and a severity of 10 years, and assume that 100 people commit this crime. Now assume that the certainty was raised -- by way of increased resources devoted to police, investigation, prosecution, etc. -- to 40%. The number of people who commit the crime would go down from 100 to $x$. This figure, $x$, is not a predictable number, i.e., it is not necessarily 50, because to determine $x$'s value one would have to know more about $f$, and where $c \cdot s$ stood in relation to it both before and after the certainty modification. Now assume, instead, that the certainty was left at 20% but the punishment was raised from 10 years to 20 years. The number of people who commit the crime would again go down from 100 to $x$, and, although $x$ would still be an unpredictable number, it would be the same number as the number of people who committed the crime when the detection rate was doubled.

An avalanche of criminological studies have determined that this theoretical symmetry between severity of punishment and certainty of detection does not exist in the real world. See Isaac Ehrlich, Participation in Illegitimate Activities: A Theoretical and Empirical Investigation, 81 J. Pol. Econ. 521, 544-47 (1973)(finding that the certainty of punishment was a more important indicator than severity in deterring murder, rape, and robbery); Harold G. Grasmick & George J. Bryjak, The Deterrent Effect of Perceived Severity of Punishment, 59 Soc. Forces 471, 472 (1980)(reviewing twelve deterrence studies and explaining that "nearly all these researchers conclude that perceived certainty of legal sanctions is a deterrent, [while] only one (Kraut) concludes that perceptions of the severity of punishment are part of the social control process"); Jeffrey Grogger, Certainty v. Severity of Punishment, 29 Econ. Inquiry 297, 304 (1991)(studying California arrestees and concluding that "increased certainty of punishment provides a much more effective deterrent than increased severity" and that a "six percentage point increase in average conviction rates would deter as many arrests as a 3.6 month increase in average prison sentences"); Steven Klepper & Daniel Nagin, The

Deterrent Effect of Perceived Certainty and Severity of Punishment Revisited, 27 Criminology 721, 741 (1989)(surveying graduate students about tax evasion scenarios and finding that certainty of punishment is an effective deterrent); Daniel S. Nagin, Criminal Deterrence Research at the Outset of the Twenty-First Century, 23 Crime & Just. 1, 13 (1998)(reviewing the literature and concluding that "cross-sectional and scenario-based studies have consistently found that perceptions of the risk of detection and punishment have negative, deterrent-like associations with self-reported offending or intentions to offend"); Daniel S. Nagin & Greg Pogarsky, An Experimental Investigation of Deterrence: Cheating, Self-Serving Bias, and Impulsivity, 41 Criminology 167 (2003)(testing whether students would cheat on a trivia quiz to earn a cash bonus and finding that cheating decreased when the certainty of detection was higher but not when the perceived severity of punishment increased); Ann Dryden Witte, Estimating the Economic Model of Crime with Individual Data, 94 Q. J. Econ. 57, 79 (1980)(studying men released from the North Carolina prison system and demonstrating that "a percentage increase in the probability of being punished has a relatively larger effect on the number of arrests or convictions than does a percentage increase in the expected sentence"); Andrew von Hirsch et al., Criminal Deterrence and Sentence Severity: An Analysis of Recent Research 47 (1999); Robert Apel & Daniel S. Nagin, General Deterrence: A Review of Recent Evidence, in Handbook on Crime and Criminal Justice (Michael Tonry ed.)(2011); Alfred Blumstein & Daniel Nagin, The Deterrent Effect of Legal Sanctions on Draft Evasion, 29 Stan. L. Rev. 241, 269 (1977)(studying draft evasion and finding a significant negative association between the probability of conviction and the draft evasion rate, leading the authors to conclude that their "findings are consistent with the work of other investigators who have argued that the certainty of punishment has a stronger deterrent effect on crime than the severity of punishment"); Aaron Chalfin & Justin McCrary, Criminal Deterrence: A Review of the Literature, J. Econ. Literature (forthcoming). Studies universally find that certainty of punishment has a far greater deterrent effect than severity of punishment.  It is difficult to pin down the extent to which real-world (empirical) findings deviate from the one-to-one rate predicted by the economic model -- i.e., whether certainty is twice as important, three times as important, or ten times as important -- as it appears to differ in different contexts.  Interestingly, studies also agree that another factor, which is entirely absent from the economic model, works to determine deterrence: the immediacy, or celerity, with which the crime is detected and the punishment

meted out.  The above studies generally find that both certainty and celerity have a greater impact on deterrence than severity.

It is not clear why certainty is so much more effective than severity at deterring criminal behavior; as is the case in many contexts, empirical studies can identify the "what" but not the "why."  It is even less clear why celerity plays any role in a potential criminal's decision.  The Court suspects that the average street-level potential criminal is more well-informed about the likelihood of getting caught, and the quickness with which he will be caught, than he is about the sentence he will receive.  From there, the potential criminal uses the information he has on hand to make his decision, and largely disregards the impact of severity, rather than trying to seek out specific information.  Drug trafficking defendants, aliens returning after being deported, and Indians off the reservation are often shocked at the severity of federal sentences as compared to prior sentences they may have received in state and tribal systems; in the Court's experience, most federal defendants have no idea how harsh federal sentences are, which would obviously prevent them from acting as an effective deterrent.

What is clear, however, is that severity of punishment continues to have some deterrent effect -- albeit less than it would were the universe of potential criminals an overall rational bunch.  See, e.g., Daniel S. Nagin, Deterrence: A Review of the Evidence by a Criminologist for Economists, 2013 Annual Rev. Econ. 5:83, 86-88, 97-98 (2013).  It also seems likely that the behavior of sophisticated potential criminals would hew more closely to the economic model than that of unsophisticated, street-level criminals.  Thus, general deterrence remains an important consideration in cases like this one, in which the perpetrators are relatively sophisticated and the certainty of detection relatively low -- and the celerity even lower.

United States v. Courtney, No. CR 11-2860-001 JB, 2014 WL 7472975, at *32 n.13 (D.N.M. Dec. 15, 2014)(Browning, J.).

A Guidelines sentence will have a greater deterrent effect than the sentence Luna-Jasso requests, even if the greatest deterrence is the certainty of being caught.  Accordingly, the deterrent effect calls for a Guidelines sentence.

United States v. Luna-Jasso, 2015 WL 1006390, at *15-18 (footnote omitted)(refusing to depart

or vary in conviction for violating the United States' immigration laws).  The Court also

criticized the fifth assertion from the article -- that there is no proof that the death penalty deters

crime.

> The Court disagrees with the fifth point: that there is no proof that the death penalty deters criminals.  While the death penalty may not act as an additional deterrent to certain abhorrent crimes -- such as especially gruesome murders -- it may act as a deterrent to protect certain classifications of victims. For instance, convicted bank robber, Matthews James Griffin, attempted to escape from prison by attacking a prison guard with a concealed blade.  See Scott Sandlin, Ninja Bandit Settles Lawsuit, Albuquerque J. (Oct. 9, 2011, 12:05 a.m.), http://www.abqjournal.com/61839/news/ninja-bandit-settles-lawsuit.html.  Griffin stated, during a deposition, that he was trying to merely maim the guard and not to kill him, because he would have received the death penalty if he had killed the guard.  See Scott Sandlin.  Additionally, during the 1980 New Mexico prison riots, while thirty-three inmates were murdered, every guard survived.  See Albuquerque Journal Editorial Board, Editorial: Killer Confirms Death Penalty Was Deterrent, Albuquerque J. (Oct. 11, 2011, 12:05 a.m.), http:// www.abqjournal.com/62094/opinion/killer-confirms-death-penalty-was-deterrent. html ("But there can be no debate that Edward Chavez and Marylyn Crawford and Todd Wilson and the guards on duty during the riot survived because killing them would have earned their attackers a death sentence.").  This evidence suggests that the death penalty deterred the inmates from murdering the prison guards.  Mark H. Donatelli, the New Mexico public defender who represented the inmates after the 1980 prison riots, disagrees.  See Mark Donatelli, Death Penalty Doesn't Keep Guards Alive, Albuquerque J. (Oct. 16, 2011), http://www. abqjournal.com/63220/opinion/death-penalty-doesnt-keep-guards.alive.html.  Mr. Donatelli argues that the inmates did not kill the prison guards, because they believed that the memories of the torture that the inmates inflicted on the guards would inflict a harm worse than death, because the inmates believed that the National Guard would open fire and slaughter the inmates if they killed the guards, or because the inmates respected the guards and did not want to kill them. See Mark Donatelli.  In any case, even if the death penalty does not deter all prison inmates from killing prison guards, it deterred Griffin, and the prison guard that he attacked survived because of the possibility of receiving the death penalty.

United States v. Luna-Jasso, 2015 WL 1006390, at *15 n.9.

The Court continues to hold these views.  Even if a severe sentence is less of a deterrent

than the certainty of being caught -- a proposition with which the Court agrees -- the sentence's

severity still carries some deterrent value.  Moreover, the Court is a court of law, and not a law

enforcement agency.  The Court has no control whether Border Patrol agents sufficiently patrol

the border, such that illegal immigrants are certain to be caught.  The Court can only increase the sentence to increase the deterrent value of the sentence.  Corchado-Aguirre argues that the Court should not increase the severity of the sentence, because increased severity is not an effective deterrence.  Because the Court's only deterrence tool is increased severity, Corchado-Aguirre is, in essence, arguing that the Court should not consider deterrence in sentencing at all.  The Court has no luxury to ignore the statute's factors, because Congress has mandated the Court to consider deterrence in crafting an appropriate sentence.  See 18 U.S.C. § 3553(a)(2)(B).  The Court must, thus, use the deterrent tools available to it in crafting sentences.  If Corchado-Aguirre wants the criminal justice system's deterrence focus to be on certainty of being caught, and not on the punishment's severity, he must lobby Congress, whose laws the Court must follow.  As the Court noted earlier, this argument may be best suited for a letter to a congressperson than for the Court, which is bound by the laws that Congress has already passed.

Corchado-Aguirre also argues that deterrence "assumes rational thinking, knowledge of and ability to evaluate outcomes, and thoughtful choices."  Memo. II at 8.  He contends that these traits are inapplicable to him.  See Memo. II at 8.  The Court disagrees.  Corchado-Aguirre pled guilty, thus acknowledging that he had the requisite mens rea to violate the United States' immigration laws.  He also concedes that he is competent.  See April 22 Tr. at 7:23-8:1 (Converse, Court).  Moreover, when the Border Patrol agents found him, Corchado-Aguirre was attempting to hide, see PSR ¶ 5, at 3, indicating that he knew that his actions were unlawful and that there would be consequences if he were caught.  Corchado-Aguirre did not, like many defendants, request the Court to order a mental evaluation by a psychiatrist or psychologist.

Congress has mandated that the Court consider deterrence in sentencing Corchado-Aguirre.  This is his fifth immigration offense.  For his last offense, he received a

sentence of 15-months imprisonment, yet that sentence was not sufficient to deter him from committing another immigration offense.   This continual disregard of the United States' immigration laws suggests that a greater-than-15-month sentence is necessary to sufficiently deter Corchado-Aguirre from committing future offenses.   General deterrence also calls for a longer sentence.  For someone to repeatedly violate United States' immigration laws, yet receive light, or increasing lighter, sentences, signals to others that it is not a big deal to repeatedly defy United States' laws.

Corchado-Aguirre argues that the denial of the Plea Agreement would lead to unfair and disparate results.  See Memo. I at 5.  He contends that the Court should not compare the Plea Agreement's resulting sentencing range with the sentence that the Western District of Texas imposed, because either the United States Attorney there did not offer or Corchado-Aguirre failed to accept a fast-track plea agreement, and because he was not given a reduction for acceptance of responsibility.  See Memo. I at 5-6.  Corchado-Aguirre blames the lack of a fast track and no reduction for acceptance of responsibility on his prior counsel's inadequacies.  He does not, however, present any evidence that his prior counsel was ineffective, other than pointing to the resulting sentence.  He contends that his attorney did not recognize his mental illness, but, then again, neither did the jail in which he was being held in Texas.  There is some evidence that his conditions were apparent -- specifically that the BOP facility that later imprisoned him and his current counsel were both able to recognize his condition; however, it is unclear whether his attorney was incompetent in not recognizing the illness.  It is also unclear whether the denial of a fast track was the result of his attorney's incompetence or a result of his mental illness.  Furthermore, it is unclear whether he was denied a reduction for acceptance of responsibility because of either his attorney's incompetence or his mental illness.  There is a lot

of speculation in Corchado-Aguirre's argument; his argument may be true, but he does not give the Court any factual evidence to support the statement. The PSR notes that the presentence investigation report from Texas states that Corchado-Aguirre was denied the reduction because he threw "water/urine" at a correction officer. PSR ¶ 23, at 6. At the July 16, 2015, hearing, Corchado-Aguirre asserted that he threw tea at the correction officer, and not water or urine. See July 16 Tr. at 6:1-7:16 (Converse, Court). Regardless what liquid he threw, the Court cannot say that Judge Moses would have given the reduction if she knew the liquid-throwing incident involved tea rather than urine. Corchado-Aguirre's attack of his prior sentence is based on speculation. He can only speculate that, if he had a competent attorney, he would have been granted a fast track and an acceptance-of-responsibility reduction. He can also only speculate that, if the Judge Moses and the United States Attorney for that district had known about his mental illness, he would have been granted a fast track and an acceptance-of-responsibility reduction. The Court does not believe that speculation is a sufficient reason to disregard or discount so much the sentence that another judge imposed.

Corchado-Aguirre is correct in noting that the fast-track program's existence results in disparate treatment. This disparate treatment, however, is just a side effect of how the fast-track program works. The United States Attorney in each district has discretion whether to grant a fast track in each case. See Memorandum at 2-4. Sentencing statistics from each circuit show that, depending on the circuit in which the defendant is sentenced, he or she has a much greater or much lesser chance of receiving a fast track. In 2014, the percentage of defendants in immigration cases who received fast tracks in each circuit varied from 2.3% in the Fourth Circuit to 59.8% in the Ninth Circuit. Compare United States Sentencing Commission, Statistical Information Packet: Fiscal Year 2014 First Circuit at 21 (stating that 17.4% of immigration

offenders receive fast tracks), with United States Sentencing Commission, Statistical Information Packet: Fiscal Year 2014 Second Circuit at 21 (stating that 10.7% of immigration offenders receive fast tracks), with United States Sentencing Commission, Statistical Information Packet: Fiscal Year 2014 Third Circuit at 21 (stating that 8.7% of immigration offenders receive fast tracks), with United States Sentencing Commission, Statistical Information Packet: Fiscal Year 2014 Fourth Circuit at 21 (stating that 2.3% of immigration offenders receive fast tracks), with United States Sentencing Commission, Statistical Information Packet: Fiscal Year 2014 Fifth Circuit at 21 (stating that 7.8% of immigration offenders receive fast tracks), with United States Sentencing Commission, Statistical Information Packet: Fiscal Year 2014 Sixth Circuit at 21 (stating that 6.8% of immigration offenders receive fast tracks), with United States Sentencing Commission, Statistical Information Packet: Fiscal Year 2014 Seventh Circuit at 21 (stating that 5.3% of immigration offenders receive fast tracks), with United States Sentencing Commission, Statistical Information Packet: Fiscal Year 2014 Eighth Circuit at 21 (stating that 16.5% of immigration offenders receive fast tracks), with United States Sentencing Commission, Statistical Information Packet: Fiscal Year 2014 Ninth Circuit at 21 (stating that 59.8% of immigration offenders receive fast tracks), with United States Sentencing Commission, Statistical Information Packet: Fiscal Year 2014 Tenth Circuit at 21 (stating that 28.0% of immigration offenders receive fast tracks), with United States Sentencing Commission, Statistical Information Packet: Fiscal Year 2014 Eleventh Circuit at 21 (stating that 4.5% of immigration offenders receive fast tracks), with United States Sentencing Commission, Statistical Information Packet: Fiscal Year 2014 D.C. Circuit at 21 (stating that 33.3% of immigration offenders receive fast tracks).  The very nature of the fast-track program will result in some disparity between defendants sentenced in different districts.

As early as 2012, when the United States Attorney General broadened the fast-track program to every district, the Court noticed issues concerning disparity and deterrence.  On October 31, 2012, the Court wrote a letter to the Federal Public Defender for the District of New Mexico, Steve McCue, and to the then-United States Attorney for the District of New Mexico, Kenneth Gonzales.  See Letter from the Court to Steve McCue, Federal Public Defender, and the Honorable Kenneth Gonzales, then-United States Attorney, now-United States District Judge for the District of New Mexico, Regarding Current Fast Track Program (dated Oct. 31, 2012)("Court Letter").  The Court noted that it was "under the impression that the current DOJ leadership had the goals of establishing some consistency among the southwest border districts in terms of the[] fast-track plea programs, but apparently that [was] not happening," and that the way the program was being enacted "create[d] sentencing disparity issues as well as 'deterrence' issues."  Court Letter at 1.  The Court stated that it "ha[d] been reluctant to reject plea agreements or to sentence" defendants to a sentence "other than at the low end of the applicable range, for fear that [the] sentence could create unwarranted sentencing disparities among similarly situated defendants wi[th] similar criminal histories."  Court Letter at 2.  The Court said that it was "hesitant to stop [its] current routine practice" of accepting plea agreements and sentencing at the low end of the Guidelines range "without giving the criminal bar some warning that [the Court] may refuse the agreement if [it] think[s] the sentence is inappropriately short."  Court Letter at 2.  Specifically, the Court pointed out the difficulty in "justify[ing] a much shorter sentence than one imposed previously for the same statutory violation."  Court Letter at 2.  In addition to asking the Federal Public Defender and the United States Attorney for their comments, the Court asked them to tell it what other border districts were doing with their fast-track programs.  See Court Letter at 1.

The Federal Public Defender responded to the Court's letter on November 29, 2012.  See Letter from Steve McCue, Federal Public Defender, to the Honorable James O. Browning, United States District Judge for the District of New Mexico, Regarding Fast Track Program (dated Nov. 29, 2012)("Public Defender Letter").[9]  The Public Defender recognized the Court's disparity concerns and noted that much of this disparity comes from districts using different policies to implement their fast-track programs.  See Public Defender Letter at 1-2.

> Disparity is one of the sad facts of life in the criminal justice system. Criminal sanctions in similar cases vary from case to case according to the district, the prosecutor, the defense attorney, the probation officer, and the judge. Indeed, 18 U.S.C. § 3553(a)(6) recognizes this fact by stating that it is only "unwarranted" disparity among similarly situated cases that should be avoided. Disparity arises from changes in policy, e.g. the Fair Sentencing Act of 2010, which reduced sentences for crack cocaine, and from the passage of time, e.g. the time limits on use of prior convictions in §§ 4A1.2(e) & 2L1.2(b)(1)(A)&(B) U.S.S.G.  The Tenth Circuit has recognized that disparity with respect to fast track programs may be a valid basis for departure or variance.  See United States v. Lopez-Avila, 665 F.3d 1213 (10th Cir. 2011).

> Within national guidelines, the government's fast track policies are implemented differently in different districts.  Local discretion allows prosecuting authorities to respond most appropriately to the realities and needs of their district.  For instance, in the Southern District of Texas, which deals with the bulk of the immigration cases in the United States, some divisions of the court have fast track policies while others do not.  The Federal Defenders in Houston report that they rarely see reentry after deportation cases unless the defendant is eligible for a 16 level or a 12 level adjustment under § 2L1.2(b) U.S.S.G.  The "(a) level" or "(b)(1)" 8 U.S.C. § 1326 felony cases we see here in New Mexico typically are charged as petty misdemeanor Entry without inspection contrary to 8 U.S.C. § 1325 in South Texas and in other border districts.

Public Defender Letter at 1-2.

The Public Defender addressed the Court's deterrence concerns by stating that the severity of a criminal punishment is not a great deterrent and that the United States should not be

---

[9]The Public Defender also captioned his letter to Kenneth Gonzales, the United States Attorney, and all United States District Judges for the District of New Mexico.  See Public Defender Letter at 3.

using criminal sanctions to deal with illegal entry into the United States.  See Public Defender

Letter at 2-3.

>   While specific and general deterrence are goals of criminal sentencing,
>   reentry cases pose special problems.  In general, individuals who are eligible for
>   the government's fast track plea offers have little criminal history.  Most of these
>   individuals come to the U.S. to work and to support their families.  Balanced
>   against the potential criminal sanctions for reentering the United States are the
>   abject poverty and violence these individuals experience in Mexico.  In light of
>   these significant countervailing economic and social factors, the possibility of
>   time in jail likely is of diminished importance in the decision to return to the
>   United States.  Studies have shown that it is the certainty of apprehension and
>   punishment, rather than the severity of sentence, that is a deterrent to criminal
>   behavior.
>
>   The logic for imposing criminal sanctions for reentering or being found
>   illegally in the United States is difficult to fathom.  The gist of the offense is that
>   the defendant should not be here.  In order to make that point, we keep the
>   individual here at the cost of more than $28,000 per defendant per year to U.S. tax
>   payers.  The more time individuals from Mexico spend in the U.S. corrections
>   facilities, the more acculturated to the U.S. they become. . . .
>
>   It is against this background that the Court must impose sentence.  Use of
>   the criminal justice system to solve the social problems is a poor substitute for
>   effective social policy.  E.g., "The War on Drugs."

Public Defender Letter at 2-3 (citations omitted).  The Public Defender went on to discuss the

benefits of the fast-track program and to urge the Court to continue to accept fast-track plea

agreements.  See Public Defender Letter at 3.

>   The current New Mexico fast track policy, authorized by Congress and the
>   Department of Justice and instituted in February 2012, is more beneficial to many
>   clients than the prior fast track.  It is our position that the new fast track is a
>   recognition of the fact that the sentences the Court previously was required to
>   impose were unnecessarily and inappropriately long.  While implementation of
>   the new policy appears to present an anomaly with respect to clients who
>   previously received inappropriately lengthy fast track sentences, I submit that the
>   new policy presents the court with an opportunity to rectify the previously
>   inappropriate sentences.  Of course, the Court reserves the right to impose the
>   sentence it feels is appropriate under 18 U.S.C. § 3553(a) and Rule 11 FRCP.
>   The current fast track policy preserves a great deal of discretion for the Court.
>   The court also retains the option of rejecting the plea agreement.  We would urge
>   the Court to continue to follow its current policy of accepting the fast track plea

agreements negotiated and entered into by the parties and imposing sentence based on the individual characteristics of the client before the Court.

Public Defender Letter at 3.

The United States Attorney responded to the Court's letter on December 6, 2012. See Letter from Kenneth J. Gonzales, United States Attorney, to the Honorable James O. Browning, United States District Judge for the District of New Mexico, Regarding Fast Track Program (dated Dec. 6, 2012)("U.S. Attorney Letter").[10]   The United States Attorney quoted from the Memorandum to show that every district must implement a fast-track program, but that each district has some discretion to include or exclude a class of defendants from the program.

> [N]o district can choose to opt out of a Fast Track program.  Rather, I believe what some U.S. Attorneys have chosen to do is to exclude substantial numbers of defendants from their Fast Track program due to their criminal history or other permissible factors within the U.S. Attorney's discretion.
>
> The disparity, if any, that may exist among southwest border districts would be the result of the decision to include or exclude a class of defendants from the Fast Track program.  Every defendant who is offered a Fast Track plea agreement, however, receives the same offer of either a two- or four-level reduction, depending on his or her criminal history.

U.S. Attorney Letter at 3.  The United States Attorney stated that he could not provide the Court with details of other fast-track policies, but he explained how the District of New Mexico carries out its policy.  See U.S. Attorney Letter at 3.

> The Court requested that I provide detailed information on the Fast Track policies of the other southwest border districts.  In response to the Court's request, I asked the Executive Office of the United States Attorneys whether I was at liberty to disclose the fast track policies of other districts, and was told that I am not.  As a result, I am unable to comply with the Court's request.
>
> In the District of New Mexico, we have chosen not to deny a Fast Track opportunity to any class of defendants.  While most defendants will receive an offer of a four-level reduction, there are two instances where a defendant could,

---

[10]The United States Attorney captioned the U.S. Attorney Letter to Stephen McCue, the Federal Public Defender for the District of New Mexico.  See U.S. Attorney Letter at 4.

**with supervisory approval**, receive an offer of only a two-level reduction. Those defendants with a criminal history category of VI and those who have a prior crime of violence conviction may receive the two-level reduction offer. Alternatively, if supervisory approval was declined, this class of defendant would be denied any Fast Track opportunity.

After review of the Sentencing Commission charts provided by U.S. Probation at the Court's direction, I would note that a significant difference between the District of New Mexico and other districts is that this district prosecutes § 1326 cases that other districts may choose not to prosecute: this district prosecutes *all* § 1326-eligible cases, not just (b)-level cases.   Some districts may not prosecute § 1326(a) cases at all; others may have adopted the practice of pleading those cases to an 8 U.S.C. § 1325 charge, a misdemeanor, which completely removes the case from their fast track programs.  The inclusion of § 1326(a) cases naturally causes our district's average sentences in immigration cases to be lower than other border districts' statistics.

This approach of the executive branch was the decision of the U.S. Attorney for the District of New Mexico to make our program one of inclusion rather than exclusion, while other southwest border districts may choose to emphasize exclusion of defendants in theirs.   Either approach is within the guidelines contained in the Deputy Attorney General's policy memorandum of January 12, 2012.  A comparison among the programs would be difficult because of the differences in the intake policies of the individual districts.

With regard to the Court's question as to why the U.S. Attorney for the District of New Mexico has chosen to use a Rule 11(c)(1)(C) Fast Track offer in our program, it is an essential tool to assure prompt movement of Fast Track cases through the Court's docket.  Immigration defendants are concerned primarily with the length of the sentence they will receive.  Rule 11(c)(1)(C) offers provide, subject to Court approval, that defendants may receive a sentence that is certain. If Rule 11(c)(1)(C) offers were not provided, we anticipate that the Court would be faced with Form 13 motions in a substantial majority of § 1326 prosecutions. If the Court denied these Form 13 motions, those cases for the most part would be indicted, placed on trial calendars, and be the subject of numerous motions to continue trial dates.   Thus, the use of Rule 11(c)(1)(C) offers provides the defendant a greater degree of certainty regarding his or her sentence, and, as a result, expedites the resolution of immigration cases.

U.S. Attorney Letter at 3-4 (emphases in original).

The United States Attorney went on to affirm the Court's discretion in sentencing

defendants who receive fast tracks.  See U.S. Attorney Letter at 4.

This does not leave the Court without recourse if the agreed-upon offense level is deemed to be too lenient or too harsh. The Court can sentence on the high or low end of the agreed-upon Guideline range, or reject the agreement. In the event rejection of the agreement is chosen by the Court, the parties will have a presentence report to use in further plea negotiations.

U.S. Attorney Letter at 4.[11]

Accordingly, the Court has been aware of the deterrence and disparity issues since 2012. As explained above, however, Congress has commanded the Court to consider deterrence, which includes specific deterrence, in sentencing criminal defendants. A recent prior sentence, which a defendant received for the same offense, indicates that the sentence was not sufficient to specifically deter him or her from committing the same offense again. Section 3553(a), thus, calls for the Court to impose a higher sentence. Moreover, disparity is simply a nature of the fast-track system, because each district has discretion in how to implement its fast-track policy, and because the frequency in which fast tracks are given in each circuit varies significantly. The Court does not believe that this disparity, however, warrants the Court to impose a sentence that does not faithfully follow § 3553(a)'s factors in specific cases with a particular defendant, especially when the Court's final sentence falls within the Guidelines range.

Consequently, respect for the law, general deterrence, and specific deterrence all call for a lengthier sentence than the Plea Agreement indicates. Corchado-Aguirre's applicable Guidelines range, after taking into account the Plea Agreement's 4-offense level reduction, is 6 to 12 months. This range, if accepted, would provide a shorter sentence than he received in the Western District of Texas in 2012. As discussed earlier, Corchado-Aguirre's 15-month sentence

---

[11]The Court mentions these three letters only to show that it has been cognizant of the deterrence and disparity issues since 2012. In sentencing Corchado-Aguirre and issuing this Memorandum Opinion, the Court has not specifically relied on the information or assertions which the United States Attorney or the Federal Public Defender provided in their respective letters, but the information that they provided has become the general education and knowledge that this Court brings to the courtroom in this case and in every immigration case.

did not adequately deter him from committing additional immigration offenses.   Section 3553(a)'s requirement that the Court consider the deterrent value of its sentence, accordingly, counsels for a sentence that is greater than 15 months.   Consequently, the Court concludes that the Plea Agreement's resulting range does not adequately reflect § 3553(a)'s factors, and the Court will reject the Plea Agreement.

## II.   THE COURT WILL NOT DEPART DOWNWARD OR VARY BECAUSE OF CORCHADO-AGUIRRE'S MENTAL ILLNESS.

The Court will not depart downward or vary because of Corchado-Aguirre's mental illness.[12]   Corchado-Aguirre's arguments concerning mental health appears to fall into two categories: (i) that the Court should depart because of his mental illness; and (ii) that the Court should not consider the Western District of Texas sentence, because his mental illness caused him to be denied an acceptance-of-responsibility reduction and possibly a fast track.   The Court concludes that these rationales do not warrant downward departure in this case.

First, Corchado-Aguirre has not shown that his mental illness causes his case to fall outside the heartland of reentry cases or even in federal cases in general.   A departure is warranted if the case is "unusual enough for it to fall outside the heartland of cases in the Guideline."   Koon v. United States, 518 U.S. at 92.   Corchado-Aguirre has not, however, shown how his mental illness causes him to fall outside the heartland of cases in the Guidelines.   A large percentage of criminal defendants suffer from mental illness.   See Richard E. Redding, supra, at 408-09.   Corchado-Aguirre is not so different from a substantial number of criminal defendants who appear before the Court, other judges in the district, or other districts in the

---

[12]In resolving sentencing issues -- i.e., whether to vary or depart, and what sentence to give -- the Court will cite to the Memo. II, which Corchado-Aguirre filed after the Court rejected the Plea Agreement.

nation.  Consequently, the Court concludes that Corchado-Aguirre's mental illness does not place him outside the heartland of reentry cases.

Second, and to what appears to be Corchado-Aguirre's primary argument, there is not sufficient evidence for the Court to conclude that Corchado-Aguirre's mental illness affected his sentence in the Western District of Texas.  He asserts that his counsel provided ineffective assistance, which resulted in his mental illness not being discovered and in him not receiving a fast-track sentence.  He also asserts that the failure to recognize his mental illness resulted in a denial of an acceptance-or-responsibility reduction.  There is not, however, any evidence to support Corchado-Aguirre's accusations that he lodges against his former attorney.

Corchado-Aguirre does not point to any case in which a court departed downward because the defendant received ineffective assistance of counsel in a prior case.  Instead, he asserts that "[e]rroneous prior confinement has been recognized pre-Booker as an extraordinary circumstance not contemplated by the USSC."  Memo. II at 5.  The cases which he cites to support this proposition, however, do not support his position that ineffective assistance of counsel in a prior case should lead to a downward departure.  Instead, they state that, if a prior sentence was erroneous -- i.e., contrary to law -- then the sentencing court can depart downward to account for the prior erroneous sentence.  See  United States v. Carpenter, 320 F.3d 334, 344-45 (2d Cir. 2003)(holding that district court was permitted to depart downward when a prior sentencing court did not follow binding precedent by sentencing the defendant to a longer sentence than permitted by law).  Corchado-Aguirre must, consequently, show that his prior sentence was contrary to law because of his prior attorney's ineffective assistance.

In considering ineffective-assistance-of-counsel claims for attorneys' conduct in sentencing, courts apply the standard from Strickland v. Washington, 466 U.S. 668 (1984).  See,

e.g., Lafler v. Cooper, 132 S. Ct. 1376, 1386 (2012)("Even though sentencing does not concern the defendant's guilt or innocence, ineffective assistance of counsel during a sentencing hearing can result in Strickland prejudice because 'any amount of [additional] jail time has Sixth Amendment significance.'"   (quoting Glover v. United States, 531 U.S. 198, 203 (2001)) (alteration in Lafler v. Cooper but not in quoted source)).   Accordingly, Corchado-Aguirre must satisfy the test from Strickland v. Washington to show that his prior attorney gave ineffective assistance.

> To prevail on his ineffective-assistance claims, Mr. [Corchado-Aguirre] would ultimately need to show that
>
> - his counsel's representation "fell below an objective standard of reasonableness" and
>
> - "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

United States v. Rodriguez, 768 F.3d 1270, 1273 (10th Cir. 2014)(quoting Strickland v. Washington, 466 U.S. at 687-88, 694).   The Court concludes that Corchado-Aguirre fails both prongs.

For the first prong, Corchado-Aguirre has not shown that his previous attorney's representation was objectively unreasonable.   He asserts that his prior attorney's representation was ineffective in two ways: (i) he did not attend Corchado-Aguirre's presentence interview; and (ii) he failed to recognize Corchado-Aguirre's mental illness.   Corchado-Aguirre's first assertion of ineffective assistance -- that his attorney was not present for the presentence interview -- fails, as a matter of law, because he had no right to counsel at his presentence interview.   See United States v. Benlian, 63 F.3d 824, 827 (9th Cir. 1995)(holding that attorney's failure to attend presentence interview did not constitute ineffective assistance of counsel, because the interview

was not a critical stage in the adversary proceedings); United States v. Lewis, Nos. 03-4112, 04-6660, 2006 WL 678931, at *1 (4th Cir. Mar. 15, 2006)(unpublished)("Even if Lewis's attorney did not attend his presentence interview, this could not constitute ineffective assistance because there is no Sixth Amendment right to counsel at the interview."  (citing United States v. Hicks, 948 F.2d 877, 885 (4th Cir. 1991)); United States v. Haworth, Nos. CR 05-0014 E/BLW, CIV 05-0503 E/BLW, 2008 WL 740328, at *5-6 (D. Idaho Mar. 13, 2008)(Lynn Winmill, C.J.)("Haworth states a claim for relief only if the Sixth Amendment right to counsel applies to the presentence interview.  It does not.  The right to counsel only applies to critical stages of the criminal proceedings."  (internal quotation marks omitted)); United States v. Puckett, Nos. CR 02-0206 K, CIV 10-0721 K, 2010 WL 5186628, at *3 (N.D. Tex. Nov. 10, 2010)(Kaplan, M.J.)("Likewise, defendant cannot establish that he received ineffective assistance of counsel in connection with his presentence interview.  A defendant has no constitutional right to counsel during an interview by a probation officer . . . .")).  See also United States v. Washington, 11 F.3d 1510, 1517 (10th Cir. 1993)("Therefore, defendant had no Sixth Amendment right to the presence or advice of counsel during his presentence interview.").  Accordingly, Corchado-Aguirre's attorney was not required to attend the presentence interview, and his assistance was not ineffective for not doing so.

Corchado-Aguirre's second assertion -- that his previous attorney failed to recognize his mental illness -- also does not rise to the level of objective unreasonableness.  It appears that not only did his attorney not recognize his mental illness, but the jail in Texas also failed to recognize it.  See April 22 Tr. at 4:21-24 (Converse)(noting that the jail in Del Rio failed to recognize Corchado-Aguirre's mental illness).  Corchado-Aguirre does not present any evidence showing that his illness was so apparent that his prior attorney was objectively unreasonable in

not recognizing his illness.  He contends that, in this case, his current attorney recognized his illness and that the staff at the Torrance County Detention Facility ("TCD") recognized his condition.  He also contends that, after being sentenced in the Western District of Texas, the BOP facility, to which he was sent, recognized his condition.  Corchado-Aguirre does not, however, have any evidence showing that his mental illness was obvious when his prior attorney represented him, such that his illness would be apparent to someone who lacked medical training.

The BOP employs medical personnel to evaluate and care for its inmates.  Moreover, the Addendum shows that TCD's mental health services examined Corchado-Aguirre on March 12, 2015, and that he went through an initial mental health assessment on January 11, 2015.  See Addendum at 1-2.  Corchado-Aguirre asserts that at TCD a psychiatrist examined him on March 12, 2015.  See Memo. II at 4.  That medical professionals recognized Corchado-Aguirre's illness does not mean that his prior counsel -- who likely does not have a degree in medicine or an advanced degree in psychology -- was objectively unreasonable in not recognizing his illness.  Therefore, Corchado-Aguirre's only evidence that his prior attorney should have recognized his mental illness is his recent behavior and that his current counsel recognized his condition.  The Court does not believe that this evidence is sufficient, on the limited record before the Court, to find that it was objectively unreasonable for his former attorney to not recognize Corchado-Aguirre's mental illness.

The Addendum notes that, during a mental health service interview, Corchado-Aguirre "was feeling agitated, paranoid, tense, restless, frightened and constricted with rapid speech." Addendum at 1.  It also states that he made "odd" comments, including that he could not eat or drink, and that he wanted to kill himself because of his relationship with God.  Addendum at 1.

First, there is no evidence that Corchado-Aguirre exhibited these characteristics when he met with his prior attorney or that he made odd comments to his prior attorney. Corchado-Aguirre is asking the Court to speculate that, because he is exhibiting the symptoms now, he also exhibited them then, and that, because he made odd statements recently, he also made odd statements to his prior counsel. The Court finds this assertion too speculative for it to find that the prior attorney was objectively unreasonable in not diagnosing Corchado-Aguirre with a mental illness. Second, even if Corchado-Aguirre displayed these symptoms in 2012, the Court cannot say that it was objectively unreasonable for his attorney to recognize that he suffered from a mental illness. Many criminal defendants in custody may act agitated, tense, restless, frightened, or talk rapidly. As for the paranoia and odd statements, depending on how odd the statements are, the Court cannot say that it was objectively unreasonable for his prior attorney to chalk up the paranoia and odd statements to Corchado-Aguirre acting strangely and just being an odd person, rather than being mentally ill. Finally, that one attorney recognized the mental illness does not mean that another attorney was objectively unreasonable in not recognizing it. Corchado-Aguirre must show that an objectively reasonable attorney would have recognized the mental illness for his attorney's conduct to be objectively unreasonable. The Court concludes that Corchado-Aguirre has not made that showing.

Moreover, Corchado-Aguirre has not shown that he would have received a lighter sentence if his attorney attended the presentence interview or if the attorney recognized his mental illness. Strickland v. Washington requires Corchado-Aguirre to show that there is a reasonable probability that the outcome at sentencing would have been different if his attorney had given effective assistance. See 466 U.S. at 694.

> It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of

counsel would meet that test, and not every error that conceivably could have
influenced the outcome undermines the reliability of the result of the proceeding.

Strickland v. Washington, 466 U.S. at 693 (citation omitted).  Mere speculation about a different
result is insufficient.  See Henderson v. Kibbe, 431 U.S. 145, 157 (1977)("Even if we were to
make the unlikely assumption that the jury might have reached a different verdict . . . , that
possibility is too speculative to justify the conclusion that constitutional error was committed.").
Here, Corchado-Aguirre can only speculate as to what the outcome of his previous case would
have been if his mental illness was known and if his attorney attended the presentence interview.
This conjecture is insufficient to satisfy the Strickland v. Washington standard.  See Bowen v.
Foltz, 763 F.2d 191, 194 (6th Cir. 1985)("The Court provided little guidance concerning the
degree of certainty needed to show a 'reasonable probability' of differing results, but at very
least a defendant must make more than merely speculative assertions."); United States v.
Livingston, 490 F. App'x 153, 156 (10th Cir. 2012)(unpublished)("Although we ask a defendant
to show only a 'reasonable probability' of a different outcome, 'mere speculation is not sufficient
to satisfy this burden.'"  (quoting Byrd v. Workman, 645 F.3d 1159, 1169 (10th Cir. 2011)).

Corchado-Aguirre has not presented any evidence that his attorney's conduct resulted in
the denial of a fast track or in the denial of an acceptance-of-responsibility reduction.  He
concedes that he does not know why he was not offered a fast track in the Western District of
Texas.  See Memo. II at 6-7.  It is not clear how Corchado-Aguirre can argue that certain
differences in his counsel recognizing his mental illness would have resulted in him receiving a
fast track, when he does not even know why he was denied one in the first place.  As the earlier
discussion suggests, the United States Attorney for the Western District of Texas may not have
been offering anyone fast tracks or Corchado-Aguirre might have been otherwise ineligible for
the Western District of Texas' program.  He thus fails to show that his prior attorney's conduct

would have probably resulted in him receiving a fast track.  The same reasoning applies to his denial of an acceptance-of-responsibility reduction.  The PSR states that Corchado-Aguirre was denied the reduction because he threw water or urine on a corrections officer.  At the July 17, 2015, hearing, Corchado-Aguirre said that he threw tea on the corrections officer, and not urine. Corchado-Aguirre has not presented any evidence, however, showing that, if Judge Moses knew about his mental illness, he would have received the reduction, despite the liquid-throwing incident.  All he can do is speculate, which is insufficient to satisfy Strickland v. Washington.

Finally, even if Corchado-Aguirre's prior counsel was ineffective, either in a constitutional sense or in a more general, lay sense, the Court would still not depart.  The fact remains that -- however and why he got a 15-month sentence -- he got it, and yet he came back over to the United States.  How and why he got the 15-month sentence is far less significant to the Court than the fact that he got it and that it failed to deter him from committing the same crime yet again.

Corchado-Aguirre has, accordingly, failed to show that his prior sentence was erroneous or that his prior attorney gave him ineffective assistance of counsel.  Furthermore, his mental illness does not place him outside the heartland of reentry cases.  Consequently, the Court will not depart on the basis of his mental illness.

The Court will deny any other requests for a departure that Corchado-Aguirre may be making, whether he is basing it on ineffective assistance of counsel and mental illness, or in combination with other factors.  While a departure is, under Koons v. United States, 518 U.S. 81 (1996), authorized for such factors, the Court concludes that a departure is not warranted under the facts and circumstances of the case.  The Court has trouble squaring his criminal conduct in this case with the allegations of low capacity for framing rational thought.  In any case, the Court

chooses not to depart because it does not believe that departure is warranted under the facts and circumstances here.  Unfortunately, the federal prisons contain many individuals who have some diminished capacity because of drugs, poor upbringing, fetal alcohol syndrome, low IQ, mental illness, or other factors.  The Court is having trouble distinguishing this case from many others, except for the excellent representation that Corchado-Aguirre is receiving in the case.  The Court remains convinced that the case fits into the heartland of cases that it sees, that other judges in the district see, and that the federal district courts throughout the nation see.  Thus, while departure is authorized under the law for these factors in extraordinary cases, and even if a departure were warranted under the facts of the case, the Court would exercise its discretion not to depart, because of its belief that the case remains a heartland case, and because of the deterrence, the need for a just sentence, and respect for the law, factors that need more emphasis in this case.

## III.   THE COURT WILL DEPART DOWNWARD FROM A CRIMINAL HISTORY CATEGORY IV TO A CRIMINAL HISTORY CATEGORY III.

The Court will depart downward from a criminal history category IV to a criminal history category III.  Section 4A1.3(b) states: "If reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted."  U.S.S.G. § 4A1.3(b)(1).  The USPO recommends the departure, and Corchado-Aguirre joins the USPO's request for the departure.  The United States does not object to it.  Corchado-Aguirre's only convictions are for immigration offenses that did not involve violent conduct.

Additionally, two of his offense-level points come from the fact that he was on supervised release when he committed this offense.  Section 5D1.1 counsels against imposing

supervised release when it is not required by statute and the defendant will likely be deported after imprisonment.  See U.S.S.G. § 5D1.1(c) ("The court ordinarily should not impose a term of supervised release in a case in which supervised release is not required by statute and the defendant is a deportable alien who likely will be deported after imprisonment.").  While Judge Moses is free to use her discretion whether to impose supervised release on deportable aliens, the Court, as a matter of course, does not.  When there is a verdict or plea, supervised release imposes additional costs on the United States government, and the normal benefits of supervised release -- rehabilitation through close monitoring -- are inapplicable to deported aliens. Additionally, if a deported defendant reenters the United States through a different state or district, the supervised release creates additional strain on the judicial system.  The defendant will be tried and sentenced in one district, and then must be transferred to a different district to resolve the violation of supervised release or the violation is transferred.  In the Court's view, while many great judges use supervised release in exactly this case's situation, the Court thinks that this approach is sort of kicking the can down the road, either to another case or to another judge.  The Court would rather work hard in trying to come up with the right sentence for the defendant in the case before the Court, rather than giving a low sentence with supervised release, and hope that it gets sorted out down the road.  Finally, in imposing sentence, the Court takes into account the time in between convictions.   If a defendant was recently deported before reentering the United States, the Court takes that into consideration in crafting its sentence. Once the Court imposes a higher sentence for the short time between convictions it does not believe the defendant should be doubly punished by having even more time tacked on for violating supervised release.  Consequently, while the Court believes that the Western District of Texas was well within its authority to impose supervised release, that Corchado-Aguirre's

criminal history went up because he was under supervised release places some pressure on the Court to depart downward on the criminal history category.

As the Court has expressed earlier, it is concerned that Corchado-Aguirre has offended frequently in the past and may violate the nation's immigration laws in the future. It does not believe that his criminal history category substantially over represents the likelihood that the defendant will commit other crimes. The Court is persuaded, however, that the criminal history category of IV over represents the seriousness of his criminal history. Accordingly, because Corchado-Aguirre's criminal history is over represented, the Court will depart downward and will use a criminal history category III in determining the Guidelines range. With an offense level of 10, and a criminal history category III, the Guidelines range is 10- to 16-months.

## IV.   THE COURT WILL SENTENCE CORCHADO-AGUIRRE TO 16-MONTHS IMPRISONMENT.

The Court will sentence Corchado-Aguirre to 16-months imprisonment. Congress requires the Court to consider deterrence in crafting an appropriate sentence. Deterrence includes both general and specific deterrence. Corchado-Aguirre previously received a sentence of 15-months imprisonment, yet he was back in the United States a short time later. It thus appears that a 15-month sentence is not sufficient to deter him from violating the United States' immigration laws. Accordingly, the Court will sentence Corchado-Aguirre to a longer sentence to reflect Congress' mandate that the Court consider deterrence in composing a sentence. Congress also requires the Court to craft a sentence that promotes respect for the law and to provide just punishment. See 18 U.S.C. § 3553(a)(2)(A). Because this is Corchado-Aguirre's fifth immigration offense, a longer sentence is necessary to promote respect for the law and to provide a just punishment.

For deterrence, Corchado-Aguirre's arguments in the Memo. II are essentially the same as he raises in the Memo. I -- that deterrence is not as effective as certainty of punishment and that he cannot be deterred because he is not a rational thinker.  As the Court has already explained, Congress mandates the Court to consider deterrence in sentencing, even if harsh sentences are not as great of a deterrence as the certainty of punishment.  Additionally, Corchado-Aguirre does not assert that he lacked the requisite mens rea to commit the offense or that he is incompetent.  Instead, his conduct in hiding from the Border Patrol agents suggests that he knew that his actions were wrong and that he would be punished if caught.  Corchado-Aguirre's arguments suggest that the Court should not consider deterrence at all in sentencing. Indeed, he makes that argument.  See Memo. II at 11 ("[I]t is questionable that deterrence can provide justification for sentencing defendants in general . . . .").  If Corchado-Aguirre wants the Court to not consider deterrence, he should lobby Congress, the only entity that can amend federal statutes.  In the meantime, the Court will continue to follow Congress' mandate by considering deterrence in sentencing criminal defendants.

Corchado-Aguirre argues that he is less deserving of punishment because no one was harmed by his conduct, and the minimal harm was only his entry into the United States.  See Memo. II at 12.  The Court agrees.  These facts are why he is only receiving 16 months for his fifth violation of the same offense.  If Corchado-Aguirre had committed a more serious offense -- drug trafficking, assault, rape, fraud, or murder -- after being convicted of the same offense four times earlier, his sentence would most likely be significantly longer.  That Corchado-Aguirre is only receiving 16-months imprisonment for his fifth offense is a recognition that his offense is less serious than other crimes.

The Court will also deny any requests for a variance for these reasons or others that Corchado-Aguirre advances. Corchado-Aguirre's offense level is 10 and his criminal history category is III. An offense level of 10 and criminal history category of III establishes a Guidelines range of 10- to 16-months imprisonment. To promote respect for the law, provide just punishment, and afford adequate deterrence, the Court will sentence Corchado-Aguirre to the high-end of the Guideline range. The Court will, thus, sentence Corchado-Aguirre to 16-months imprisonment. The Court has, as the two sentencing hearings and this opinion reflects, carefully considered the Guidelines, but in arriving at its sentence, the Court has taken into account the Guidelines with other sentencing goals. Specifically, the Court has considered the Guidelines' sentencing range established by the applicable category of defendant. After carefully considering all the factors in Corchado-Aguirre's case, the Court concludes that the punishment set forth in the Guidelines is appropriate for this sort of offense. The Court considered the kind of sentence and range that the Guidelines establish. The Court concludes that a sentence of 16 months reflects the seriousness of the offense; reentry may not be the most serious crime in the federal criminal code, but Corchado-Aguirre keeps committing it. The length of the sentence is necessary to reflect respect for the law, provide a just sentence, and afford adequate deterrence, both at a general and a specific level. It probably is not necessary to enter a long sentence to protect the public, because Corchado-Aguirre is not committing other crimes, but the need to avoid unwarranted sentencing disparities among defendants with similar criminal records who have been found guilty of conduct puts pressure on the Court to keep the sentence in the Guidelines range, and the Court, after focusing on Corchado-Aguirre's prior immigration sentences in reentry cases to arrive at an appropriate sentence. And, because the Court cannot use supervised release to effectively give Corchado-Aguirre education, vocational

training, or medical care to avoid or help with his problems while on supervised release, the Court believes this lack of alternatives puts upward pressure on the sentence as well.

In sum, the Court concludes that a 16-month sentence reflects each of the factors embodied in § 3553(a).  And while the Court's task as a district court is not to come up with a reasonable sentence, but to craft a sentence that reflects the factors in § 3553(a), see United States v. Conlan, 500 F.3d 1167, 1169 (10th Cir. 2007)("A district court's job is not to impose a reasonable sentence.  Rather, a district court's mandate is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)(2)."  (quoting United States v. Wilms, 495 F.3d 277, 281 (6th Cir. 2007)), the Court nonetheless thinks this sentence is reasonable.  Finally, the Court concludes that this sentence is sufficient, but not greater than necessary, to comply with the purposes of punishment in the Sentencing Reform Act.  See 18 U.S.C. § 3553(a).

In the end, Corchado-Aguirre's argument turns Booker on its head.  While defendants usually urge the Court to look at each defendant individually, and at the particular facts and circumstances of the case, here, Corchado-Aguirre is urging the Court to always accept the fast-track plea agreement, regardless of what the defendant has done in the past.  The Court has accepted hundreds of fast-track plea agreements and will probably accept hundreds more in the next few years.  If the United States Attorney is not going to screen who gets them, or if he gives them liberally, it falls on the Court to do that task.  In this particular case, the Court believes that a 16-month sentence is more appropriate than a 6-month sentence.

**IT IS ORDERED** that Corchado-Aguirre is sentenced to 16-months imprisonment.

.

UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon P. Martinez
  United States Attorney
Paul Mysliwiec
   Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

Stephen P. McCue
  Federal Public Defender
Kari Converse
   Assistant Federal Public Defender
Federal Public Defender's Office
Albuquerque, New Mexico

     *Attorneys for the Defendant*